THE HAVANA PRESS DRILL COMPANY *et al.*

*v.*

JOHN L. ASHURST *et al.*

*Filed at Springfield October 27, 1893—Rehearing denied January 9, 1894.*

1. SPECIFIC PERFORMANCE—*of oral contract—clear and satisfactory evidence required.* Where a court of equity is called on to decree the specific performance of an oral contract which is disputed, the contract must be shown by clear and convincing evidence. If the evidence is doubtful and conflicting a specific performance will not be decreed.

2. Where the contract sought to be enforced is unequivocally denied, and no one attempts to state the time, place or occasion when the agreement was made or entered into, or to give, either literally or in substance, the language employed by the parties in forming it, or the terms agreed on, the specific performance of the contract will be refused.

3. The proper proof of an oral contract is the testimony of witnesses who were present when the contract was entered into, and who are able to give, either literally or in substance, the language used by the par-

ties in forming it; and statements of witnesses as to their understand-
ings or conclusions in relation to the contract, or as to what its terms
were, if competent as evidence for any purpose, will come far short of
proving it with the certainty required by the rules governing the spe-
cific enforcement of contracts by courts of equity.

4.  Where a party claiming the right, under a parol contract, to have a
patent assigned to him by the defendant, accepts from the latter, though
reluctantly, a written agreement which amounts only to a license to use
the patent, and takes no steps to assert the right to an assignment of
the patent for six years, such delay is, of itself, evidence of consider-
able strength that a license was all that the defendant agreed to give,
even if it does not constitute an effectual bar, by limitation, to the
complainant's right to relief.

5.  Consideration—*of a license to manufacture under a patent.* After
the formation of a corporation for the making and selling of wheat
drills, one of the corporators threatened that he would go no further
with the enterprise, and would pay no more on his subscription, unless
another member of the corporation would assign a patent held by him
for an improvement in wheat drills, to the company, and the holder of
the patent, to prevent an abandonment of the enterprise, granted to the
corporation a license to use the patent : *Held,* that the grant of the
license was a mere gratuity, and might be revoked by the grantor.

6.  The performance by one party, or his agreement to perform, an
obligation already binding on him, can not form a consideration for
an undertaking by the other party to perform another act.

7.  License—*to use patent—when revocable.* Where a license to use a
patent is a mere gratuity, and the implied conditions of the gift, and
the motives or reasons which induced it, wholly fail, the court may
properly decree the cancellation of the license.

8.  Same—*words therein, construed.* A member of a corporation
granted to the latter the exclusive right to manufacture under his
patent, such grant to remain good during the life of the company, or
until the grantor should be forced out of the company : *Held,* that the
words "forced out of the company" did not mean the legal expulsion of
the grantor from his membership in the corporation, as that depended
on his holding stock, but must be understood as referring to exclusion,
by the action of the other members, from the active and responsible
management of the business of the corporation, and from the beneficial
enjoyment of the anticipated profits of the enterprise.

9.  In such case, where the conduct of one of the corporators was such
as to render the grantor's authority as manager merely nominal, and to
make it impossible for him to occupy that position with self-respect,
his vacating his office and accepting a subordinate position, and his
subsequent resignation of that, can not be relieved of the element of

moral coercion, merely because he was not actually or physically expelled therefrom.

10. And where, afterward, one of the corporators, after having obtained the title to nearly all the stock, and the control of all, prevailed on the company to abandon the further prosecution of its business, and to assign and turn over to him all its property and assets, including the license, to be held and managed by him to his own use, it was *held,* that the grantor was effectually "forced out of the company."

11. PATENTS—*jurisdiction in Federal courts—when exclusive.* In all cases brought to recover damages for the infringement of patents, or to restrain such infringements, the jurisdiction of the Federal courts is exclusive. But if a party wrongfully uses a patent belonging to another, from which he realizes profits and royalties, the State courts have jurisdiction of a bill by the rightful owner to compel him to account for the same.

12. SAME—*assignment of, by mere licensee.* A member of a corporation gave to the company the exclusive right to manufacture under a patent held by him, to hold good during the life of the company or until he was forced out of the same, in which event all rights under the patent should revert to him. After he was forced out the company he assigned the license to another member of the company: *Held,* that the company had no authority to assign the license, for two reasons: First, because the license to it did not run to its assigns; and second, before it attempted to make the assignment, the license itself, by the terms of the instrument by which it was granted, had reverted to the licensor.

13. SAME—*licensee may not contest its validity.* The licensee under a patent, in a suit to recover the royalties agreed to be paid, will not be permitted to contest the validity of the patent. There is no warranty of such validity implied in a license given thereunder, and proof of its invalidity is no defense to a suit for the promised royalties.

14. SAME—*bill for an account against wrongdoer.* Where a company manufactures implements under an assignment of a patent made by one, without authority of the real owner, the latter may, by bill in equity, compel the assignee to account to him for the royalties he had agreed to pay to its immediate assignor. In such case there is the same privity which always exists where one person has in his hands money which, *ex equo et bono,* belongs to another.

15. BAILMENT—*remedy of principal where bailee wrongfully sells.* If a bailee, having property deposited with him for safe keeping, sells it, the owner may, if he pleases, treat the sale as a nullity and recover the property from the purchaser, but he may affirm the unauthorized sale and recover from the bailee the price received.

16.  Torts—*waiver and recovery ex contractu.*   Where one person makes an unauthorized and tortious use of the property of another, and thereby realizes profits, the owner may disaffirm the transaction and sue as for a tort, or he may waive the tort and recover the money realized, in an action for money had and received.

Appeal from the Appellate Court for the Third District ;—heard in that court on appeal from the Circuit Court of Mason county; the Hon. George W. Herdman, Judge, presiding.

Mr. Charles M. Peck, for the appellant the Stoddard Manufacturing Company :

No license is assignable by the licensee unless it contains words showing it was intended to be assignable.    Walker on Patents, sec. 310 ; *Troy Factory* v. *Corning,* 14 How. 193 ; *Rubber Co.* v. *Goodyear,* 9 Wall. 788 ; *Hapgood* v. *Hewitt,* 119 U. S. 226 ; *Baldwin* v. *Sibley,* 1 Cliff. 100 ; *Searles* v. *Bonton,* 12 Fed. Rep. 143 ; *Adams* v. *Howard,* 22 id. 657 ; *Bull* v. *Pratt,* 1 Conn. 343.

There is no warrant of validity of a patent implied in a license given thereunder, and proof of invalidity is no defense to any suit for promised royalties.   *Sargent* v. *Larned,* 2 Curt. 340 ; *Birdsall* v. *Perego,* 5 Blatch. 251 ; *Marsh* v. *Dodge,* 4 Hun, 278 ; *Bartlett* v. *Holbrook,* 1 Gray, 118 ; *Pope Manf. Co.* v. *Owsley,* 27 Fed. Rep. 108 ; *Marston* v. *Sweet,* 66 N. Y. 207.

Mr. H. W. Masters, and Messrs. McCulloch & McCulloch, for the appellants :

An assignment of an imperfect invention, with all its future improvements, is an assignment of the perfected result, and the assignee is the owner of the patent when issued.    *Littlefield* v. *Perry,* 21 Wall. 205.

On an agreement to assign a future patent, the right to an assignment becomes absolute when the patent issues.    *(Satterthwait* v. *Marshall,* 4 Del. Ch. 337.)   Such a contract will be specifically enforced, in equity.   Robinson on Patents, sec. 771 ; *Hapgood* v. *Rosenstock,* 23 Blatch. 95 ; 23 Fed. Rep. 86.

Such a contract need not be in writing, but may rest in parol, and such a parol contract will be enforced, in equity, the same as if in writing.   Robinson on Patents, sec. 1228; *Whitney* v. *Burr*, 115 Ill. 289; *Burr* v. *DeLavergne*, 102 N. Y. 415; *Summerby* v. *Bunting*, 118 Mass. 279; *Burk* v. *Partridge*, 58 N. H. 49; *Lockwood* v. *Lockwood*, 33 Iowa, 509.

A corporation may enter into such a contract without special charter powers for that purpose.   *Harvester Rake Co.* v. *Marsh*, 6 Fisher, 387.

A license, which differs somewhat from an assignment, is sometimes implied from the relations existing between the patentee and other persons.   Thus, where an invention has been made by a workman at the expense of his employer, who gave him extra wages on account of his skill as an inventor, the employer, *prima facie*, has a right to use it.   *Bensley* v. *Horse Nail Co.* 26 Fed. Rep. 250.

So if one co-partner makes an invention at the cost of the firm, the right to use it becomes vested in the partnership, and is not affected by the retirement of the inventor from the firm.   *Wade* v. *Metcalf*, 16 Fed. Rep. 130; *Montrose* v. *Mabie,* 30 id. 234; *Slemer's Appeal*, 58 Pa. St. 155.

A license of the same character arises in favor of a corporation, one of whose members is the owner of a patented invention, if he knowingly permits its employment in their business, and receives his proportion of the benefits to be derived therefrom.   Robinson on Patents, sec. 833; *Detweiller* v. *Voege*, 19 Blatch. 482; 8 Fed. Rep. 600.

While the relations between the employer and employe are not such as to entitle the former to all of the inventions made by the latter, yet when such is the contract between them, the invention belongs to the employer.   Robinson on Patents, sec. 414; *Wind Mill Co.* v. *Wind Mill Co.* 8 Blatch. 295; *Bensley* v. *Horse Nail Co.* 26 Fed. Rep. 250; *Jencks* v. *Langdon Mills*, 27 id. 622.

When a workman is hired to invent, the employer will own the inventions which fall within the scope of the contract, while all others will belong to the employe. *Joliet Manf. Co. v. Dice,* 105 Ill. 649 ; *Dice* v. *Joliet Manf. Co.* 11 Ill. App. 109 ; *Damon* v. *Eastwick,* 14 Fed. Rep. 40 ; *Hapgood* v. *Hewett,* 119 U. S. 226.

Where an inventor has allowed his employer to deal with his invention as his own, he may be estopped from claiming it. *Feather Duster Co.* v. *Hibbard,* 11 Biss. 76 ; 9 Fed. Rep. 558 ; *Dickson* v. *Moyer,* 4 Wash. 68.

The contract between Ashurst and the Havana Press Drill Company conferred upon the latter the exclusive right to manufacture. Ashurst could not license any other person to do the same thing while that right continued. Robinson on Patents, sec. 1246 ; *Jackson* v. *Allen,* 120 Mass. 64 ; *Ferree* v. *Smith,* 29 La. Ann. 811.

The matters alleged in the cross-bill against the Stoddard Manufacturing Company are within the exclusive jurisdiction of the Federal courts. Robinson on Patents, 12, sec. 857 ; id. 16, secs. 851, 852 ; *Teas* v. *Albright,* 13 Fed. Rep. 406 ; *Smith* v. *Laundry Machine Co.* 20 Blatch. 360 ; 19 Fed. Rep. 825 ; *DeWitt* v. *Manufacturing Co.* 66 N. Y. 459 ; *Kelly* v. *Scroll Manf. Co.* 15 Ill. App. 547.

Mr. THOMAS N. MEHAN, and Mr. JOHN W. PITMAN, for the appellees :

Courts of equity take jurisdiction of accounts not founded in privity of contracts, but growing out of torts and constructive trusts. 1 Story's Eq. Jur. secs. 460, 461.

If a Federal court obtains jurisdiction by reason of infringement of a patent, it may then inquire into the question of title or contract between citizens of the same State, which could not come before it directly. *Bloomer* v. *Gilpin,* 4 Fish. 50.

So a State court, having jurisdiction by reason of contract, can determine other incidental matters, even the validity of

the patent, and the protection of property covered by the contract. *Sherman* v. *Champlain*, 31 Vt. 162; *McKenzie* v. *Bailé*, 4 C. L. B. 289; *Rich* v. *Atwater*, 16 Conn. 489; *Meserole* v. *Libby*, 6 Blatch. 356; *Billings* v. *Ames*, 32 Mo. 265.

Privity is the mutual or successive relationship to the same rights of property. 1 Greenleaf on Evidence, sec. 189.

To warrant specific performance, the contract must be certain, reasonable, fair, just, and not unconscionable. Conclusions of the witness are not sufficient. Fry on Specific Per. chap. 4, sec. 229, note 1; *Dice* v. *Joliet Manf. Co.* 11 Ill. App. 109; *Hartwell* v. *Block*, 48 Ill. 304; *Bowman* v. *Cunningham*, 73 id. 51; *Gosse* v. *Jones*, id. 508; *Walker* v. *Douglas*, 90 id. 445; *Stone* v. *Pratt*, 25 id. 25; *Lear* v. *Choteau*, 13 id. 39.

The court below decided properly, because the complainants in the court below were guilty of *laches*. *Breit* v. *Yeaton*, 101 Ill. 271; *Williams* v. *Rhodes*, 87 id. 57; *Walker* v. *Ray*, 111 id. 320; *Davis* v. *Atkins*, 124 id. 476; *McDowell* v. *Steel Co.* 124 id. 494.

As a general rule, subject to few exceptions, a court of chancery follows the law in applying the Statute of Limitations to cut off stale demands. *Walker* v. *Ray*, 111 Ill. 319; *Harris* v. *McIntyre*, 118 id. 281.

The cross-bill does not seek to enjoin the infringement of a patent, nor is it a question to whom the patent belongs, but it only seeks to have a license forfeited and to have an accounting for royalties. *Hartell* v. *Tilghman*, 99 U. S. 547; *Marsh* v. *Nichols*, 140 id. 344; *Manufacturing Co.* v. *Hyatt*, 125 id. 46; *Store Service Co.* v. *Clark*, 100 N. Y. 365.

Mr. JUSTICE BAILEY delivered the opinion of the Court:

On the 30th day of December, 1890, the Havana Press Drill Company, a corporation organized under the laws of this State, and having its principal office at Havana, Mason county, filed its bill in chancery, against John L. Ashurst and Lewis B. Ashurst, for the specific enforcement of an alleged

agreement to assign to the complainant certain letters patent for an improvement in wheat drills, issued by the United States to John L. Ashurst, and numbered 297,961. The facts out of which the controversy arose are somewhat complicated, but so far as they need be stated here, they are, in substance, as follows:

Robert C. Blunt, of Field's Prairie, Mason county, having invented an improvement in wheat drills, applied for letters patent covering his invention, and letters patent were issued September 21, 1869, to his legal representatives, he having died prior to that date. On June 17, 1873, George C. Blunt, having become the owner of that patent, procured another patent for a further improvement in the same drills. The machine, thus improved and known as the "Blunt Press Drill," was constructed with steel runners for the purpose of opening small furrows in the soil, into which the seed was dropped through tubes or boots running from the feed box above to the rear end of the runners, and these were followed by wheels which pressed the earth into the furrows and covered up the grain. No patents covered the device of runners or wheels, as those were common to all press drills, the patents issued to the Blunts covering the seed-box and its attachments.

In that machine, the runners were fastened rigidly both to the forward cross-piece of the frame and to the lower extremity of the feed tubes, and they were therefore incapable of adjusting themselves to any unevenness in the surface of the ground. As a consequence, whenever any one of the runners passed over a rock or other obstacle, part or all of the other runners were lifted out of the ground, and a balk or imperfection in the work was the result. This rigidity of the runners, as it seems, constituted a serious defect in the construction and operation of the machine, and interfered materially with the readiness of its sale in the market.

John L. Ashurst was a blacksmith by trade, and had taken part in constructing, testing and perfecting the improvements

for which patents were issued to the Blunts, and from 1872 to the latter part of the year 1883, he was engaged in manufacturing and selling those machines under a license from Blunt. He also seems to have obtained an assignment of the Blunt patents for the State of Kansas. He first commenced manufacturing at Kilborne, Mason county, but the citizens of Havana, in order to induce him to establish his business in that city on a larger scale, donated to him certain buildings and grounds in Havana, to which he moved his business and where he afterwards carried it on. In the course of his business he became largely indebted to the Havana National Bank, and in the winter of 1882 and 1883, in order to secure such indebtedness, he turned over to the bank his grounds, buildings, machinery, drills manufactured and being manufactured, and other property connected with his business, and the bank thereupon took possession thereof, and during the year 1883, the factory was operated under the direction of the officers of the bank, Ashurst acting as manager of the business for the bank.

In the fall of 1883, a scheme was set on foot, to which N. C. King, the cashier of the bank, Thomas F. Low, who was also an employe in the bank, John W. Rhodes, who had been in the service of the bank during the year as its general agent in the sale of the machines, and Ashurst, were parties, for the organization of a corporation to take the establishment off the hands of the bank, and engage in the business of manufacturing and selling press drills. As a result, the Havana Press Drill Company was organized, the four persons above named becoming the incorporators and stockholders. The petition for a license to incorporate bore date November 1, 1883, and the final certificate of organization bore date the 16th day of the same month.

On the 31st day of October, 1883, the day prior to the date of the petition to organize, as the evidence tends to show, articles of agreement were drawn up and signed by Ashurst

for himself, by King as cashier of the bank, and by King and Rhodes as representing the proposed corporation, in which it was agreed that, when Ashurst and the bank should convey and make good title to the proposed corporation, to all the grounds in the tract of land given by the citizens of Havana to Ashurst for manufacturing purposes and the buildings thereon, except a certain portion of the land previously deeded by Ashurst to another party, and all machinery and tools in the buildings which had belonged to Ashurst, and when Ashurst should assign all his rights in the patents of the "Blunt Press Drill" for the State of Kansas to the proposed corporation, such rights to be good during the life of the company, the company should issue to Ashurst 150 shares of its stock fully paid up. And it was further agreed that Ashurst should execute to the company his two promissory notes for $2750 each, due in two and three years after date, with six per cent interest, and deposit with the company 60 shares of the stock as collateral security, and that, on this being done, the company should execute notes to the bank for like amounts and upon like terms. And it was further agreed that the bank and Ashurst should sell to the company all drills then on hand, wherever they were, at $30 each, royalty paid, payable December 1, 1884, and March 1, 1885, with eight per cent interest, all missing parts of the drills to be made complete by the company, and Ashurst was to allow deductions on total amount for parts furnished at their net cost. And it was further agreed that all material on hand which the company could use should be inventoried at its fair cash value, and that Ashurst should be allowed for the same, and that Ashurst should manufacture, under his own and under the company's supervision, all drills the company should order him to make, the company to furnish him the buildings, money and material necessary for that purpose, Ashurst to pay Blunt all license fees and charges, and charge the company $1.50 each for all drills he might make, until he should use up the judg-

ments he then had or might thereafter recover against Blunt, the company to pay Ashurst $700 for his first year's salary.

There is some dispute whether this agreement formed the basis upon which the corporation was organized, or whether it was acted upon by the parties in its organization, but the preponderance of the evidence seems to be that, so far as it went, it embodied the understanding between the bank and the four promoters of the corporation, and that, upon the organization of the corporation, its provisions were substantially carried out.

The capital stock of the corporation was fixed at $60,000, divided into 600 shares of $100 each. Of this, King, Webb and Rhodes each subscribed for and took $13,500, and Ashurst subscribed for the residue. All of the witnesses agree that of this sum, $15,000, the amount mentioned in the preliminary agreement, was issued to him as full paid stock. Ashurst testifies that, after the various subscriptions were made, $4500 remained, and that at the suggestion of one of his fellow promoters, he subscribed for that sum also, as a mere matter of form, but that he had never asserted any ownership over that portion of the stock, or derived any benefit therefrom. It appears that thereupon the land, buildings and property constituting the manufacting plant, and the machines and material on hand, were turned over by the bank and Ashurst to the corporation, as provided in the preliminary agreement; that Ashurst executed his two promissory notes for $2750 each to the corporation, and secured the same by a deposit of 60 shares of the stock, and that the corporation executed its two notes for $2750 each to the bank, as agreed. Although the full amount of $13,500 of the capital stock of the corporation was issued to each of the other subscribers, it appears that they paid upon their subscriptions only $5000 each.

It seems that during the year 1883, Ashurst was experimenting upon a device to overcome the defects in the drill as

manufactured under the Blunt patent, that device consisting of steel springs so attached to the runners as to give to each an independent action, and so as to enable the machine to adapt itself to the inequalities of the surface, and to pass over obstacles without lifting more than a single runner out of the ground. That this device was in contemplation was known to King, Webb and Rhodes at the time the corporation was organized, but at that time it had not been perfected, nor had its practicability been fully established. The device having been finally tested and found to work satisfactorily, Ashurst, on the 11th day of January, 1884, applied for letters patent covering it, and a patent was issued to him, bearing date May 6, 1884, and numbered 297,961, that being the patent in controversy.

The drills manufactured by the corporation were named and known as the "Havana Press Drills," and the spring attachment covered by Ashurst's patent was used in manufacturing them from the beginning, and the same device was also applied to a large number of the drills formerly manufactured and still on hand, and it continued to be so used so long as the corporation continued to manufacture the drills. Soon after the patent was issued King, Webb and Rhodes began to insist upon its being assigned to the corporation, but Ashurst refused from the beginning to make such assignment. A paper however was finally drawn up and signed by Ashurst, but which is now lost, and the contents of which are in dispute. The preponderance of the evidence shows, as we think, that it was an agreement licensing the corporation to use the improvement covered by the patent in the manufacture of its drills, for a certain time and subject to certain conditions therein expressed. The loss of the paper having been discovered, another paper was drawn up and signed by Ashurst, which was as nearly a duplicate of the one lost as the parties could draw up from recollection, that paper being as follows:

"HAVANA, ILL., *Jan. 3, 1885.*

"I hereby agree to give the Havana Press Drill Company, of Havana, Ill., the exclusive right to manufacture under a certain patent, obtained by me during 1884, for a spring runner drill, numbered 297,961. The above agreement or right to hold good during the life of the said company, or until I am forced out of said company, in which case all rights under the patent revert to me.

JOHN L. ASHURST."

This agreement was afterwards duly filed and recorded in the Patent Office. On the 21st day of July, 1885, John L. Ashurst, in consideration of $1000, assigned his patent numbered 297,961, to Lewis B. Ashurst, subject to whatever rights had theretofore been given to the Havana Press Drill Company, and that assignment was also duly recorded in the Patent Office.

It appears that Rhodes afterwards obtained two patents for improvements in grain drills, those patents being numbered 355,715 and 355,716, and that he thereupon assigned the same to the Havana Press Drill Company. Rhodes having subsequently become the owner of all the stock in the corporation except the 60 shares deposited by Ashurst as collateral to his two notes for $2750 each, the corporation, by an instrument dated November 30, 1888, assigned and transferred to him the two patents numbered 355,715 and 355,716, and also the agreement with Ashurst for an exclusive right to manufacture under his patent numbered 297,961, to be held and enjoyed by Rhodes, for his own use and that of his legal representatives, during the full term of the letters patent, as fully as they would have been held and enjoyed by the corporation if the assignment had not been made. This instrument was filed for record in the Patent Office December 13, 1888.

On making this assignment to Rhodes, the corporation ceased to manufacture drills, and Rhodes, on the same day on which the assignment to him bears date, entered into an

agreement with the Stoddard Manufacturing Company, of Dayton, Ohio, in which, after reciting that Rhodes owned and controlled an agricultural implement known as the Havana Press Drill, and owned the letters patent securing the exclusive right to manufacture and sell the same, viz., the three patents above referred to, and that he was desirous of having the implement manufactured and sold under a royalty contract, and that the Stoddard Manufacturing Company was desirous of entering into such contract, it was agreed as follows:

That the Stoddard Manufacturing Company should have, hold and control, during the life of these patents, or until it should terminate the contract, the exclusive right to manufacture and sell the same, within the United States and Territories, except Mason and Fulton counties, Illinois, and that in case letters patent should thereafter be granted to Rhodes or to the Havana Press Drill Company, for improvements in press drills, the same were to be included in the license and agreement and were to be held and enjoyed by the Stoddard Manufacturing Company without any additional royalty, during the continuance of the contract; that in consideration of these agreements, the Stoddard Manufacturing Company undertook and contracted on its part, to pay Rhodes, his heirs and assigns, as license fee or royalty upon each press drill made and sold by it, containing the patented improvements, as follows: for all drills under fourteen runners, $2, and for drills with fourteen runners and larger sizes, $2.50, such royalties to be due and payable on the first day of January of each year for all drills made and sold during the preceding year, provided that whenever the royalties paid should reach the sum of $20,000, then and thereafter, the royalty or license fee should be $2; that the Stoddard Manufacturing Company should use all reasonable effort and due diligence to effect sales and supply the demand for press drills, and that it should not, during the continuance of the contract, sell any

press drills except those embodying the patented devices above named, and should designate and mark all the drills, "The Havana Press Drills;" and it was further provided that the Stoddard Manufacturing Company might terminate the contract at any time by giving six months' notice.

Under this agreement, the Stoddard Manufacturing Company has manufactured and sold a large number of press drills embodying the improvements covered by the three patents above mentioned, and has paid to Rhodes large sums of money, and has become obligated to pay him other large sums of money, on account of the royalties provided for in the agreement.

After the organization of the Havana Press Drill Company, Ashurst for a time occupied the position of superintendent, but difficulties seem to have arisen between him and the other stockholders, especially Rhodes. According to the testimony of Ashurst, the conduct of Rhodes was so continually fault-finding, dictatorial and oppressive, that he, Ashurst, was forced to vacate the position of superintendent and assume a subordinate station, and finally to leave the employ of the corporation altogether. He had in the meantime, as it seems, invented a further improvement in the spring attachments to the runners of the grain drills, and had obtained letters patent therefor, that patent being numbered 325,583, and he thereupon, after leaving the employ of the Havana Press Drill Company, caused a new corporation to be organized, having its principal office at Havana, under the name of the "Ashurst Press Drill Company," and as superintendent of that company, engaged in the manufacture and sale of grain drills under the last mentioned patent. It seems that the legal title to this patent was also assigned by John L. Ashurst to Lewis B. Ashurst.

The original bill alleged an agreement between the stockholders of the Havana Press Drill Company, entered into at the time that company was organized, which provided that all

patents obtained by any member or stockholder, for improvements in grain drills manufactured by the company should enure to its benefit and be assigned to it, and prayed for a specific enforcement of that agreement, by requiring Ashurst to execute to the company a sufficient assignment of patent numbered 297,961. By an amendment to the bill, it was alleged that Ashurst at the time of the organization of the company, agreed to assign to it that particular patent. By a subsequent amendment, Rhodes was made a co-complainant with the corporation, and the entire history of the transactions between the parties, according to the complainants' version of the same, was set forth *in extenso,* and it was charged that John L. Ashurst and Lewis B. Ashurst, or one of them, were trustees or trustee of both of the patents numbered 297,961 and 325,583, for the benefit of the Havana Press Drill Company, and that they ought to be required to assign the same to the company, for the use of Rhodes, and that they should be enjoined from assigning or transferring them to the prejudice of the complainants, and the prayer of the bill was in accordance with these charges.

The defendants answered denying the equities of the bill, and particularly denying that there was any agreement on the part of John L. Ashurst to assign or transfer either patent to the Havana Press Drill Company, and that the agreement by which Ashurst gave the company the exclusive right to manufacture under patent 297,961 was wholly without consideration and was a mere gratuity on his part, and that he, Ashurst, had been forced out of the company, and that his license to it to use that patent had thereby become terminated.

The defendants also filed their cross-bill, making the complainants and the Stoddard Manufacturing Company defendants, and alleging, among other things, the abandonment by the Havana Press Drill Company of the business of manufacturing press drills, and its assignment to Rhodes of its right to manufacture under patent number 297,961, and the assign-

ment of that right by Rhodes to the Stoddard Manufacturing Company, and the subsequent transactions between Rhodes and the last named company under that assignment, and also alleging the illegality and invalidity of these assignments, and praying for the cancellation of the license to the Havana Press Drill Company to manufacture under that patent, and also for an accounting with Rhodes in respect to the royalties received by him for the use of the patent, and with the Stoddard Manufacturing Company for the moneys still remaining due from it under its contract from Rhodes.

The cause being heard on pleadings and proofs, a decree was rendered dismissing the original and amended bills at the complainants' costs for want of equity, and finding for the complainants in the cross-bill.

The decree under the cross-bill finds that, on or about November 30, 1888, the Havana Press Drill Company ceased to manufacture drills or to use the improvement under the license, and assigned the license to Rhodes, who, in consideration of a royalty or license fee to be paid for each drill manufactured, transferred the business of manufacturing and selling drills to the Stoddard Manufacturing Company, and licensed it to manufacture and use the improvement secured by patent number 297,961 during the residue of the term of the patent; that before January 1, 1891, the Stoddard Manufacturing Company had manufactured, under the transfer and license, 2200 drills with the improvement in question as a part of each, and on that date paid to Rhodes about $4800 for royalties and license fees thereon, and that it has since manufactured about 3000 drills, and is continuing to manufacture them, with this improvement as a part thereof, on which it will pay Rhodes the royalties or license fees provided for in the agreement; that the assignment of the license by the Havana Press Drill Company to Rhodes, and by Rhodes to the Stoddard Manufacturing Company are both illegal and void; that Ashurst was forced out of the Havana Press Drill

Company, and has been deprived of all participation, interest or share in the profits, benefits and dividends of its business, by a diversion thereof to the personal and individual use of Rhodes, in the manner aforesaid, and the various reasons, conditions and considerations inducing him to make the gift of the license having wholly failed, the license should be set aside, cancelled and hereafter held for naught; that the royalties or license fees agreed to be paid to Rhodes by the Stoddard Manufacturing Company, or such part thereof as may be just and equitable, ought in equity and good conscience to be paid to Lewis B. Ashurst, and that the account thereof ought to be taken and stated, and the amount thereof decreed to him. It was accordingly decreed that the license dated January 3, 1885, and all rights, title and interest thereto, claimed by the Havana Press Drill Company, Rhodes and the Stoddard Manufacturing Company, or by any of them, be forever set aside, annulled and cancelled, and that the master state an account of all royalties or license fees which ought to be paid by Rhodes or the Stoddard Manufacturing Company, or either of them, to Lewis B. Ashurst, and of all proper credits and set-offs thereto, if any, and report the same at the next term of court.

From this decree, Rhodes and the Havana Press Drill Company appealed to the Appellate Court, and in that court the Stoddard Manufacturing Company also appeared and assigned errors. The decree having been affirmed in that court, the record is brought here by a further appeal, the same parties also assigning errors in this court.

So far as the assignments of error call in question that portion of the decree by which the original and amended bills were dismissed for want of equity, the questions presented are mere questions of fact. They are (1) whether there was an agreement among the members or stockholders of the Havana Press Drill Company at the time that company was organized, that all patents for improvements in grain drills

obtained by any of their number should enure to the benefit of the company and be assigned to it, and (2) whether at the same time there was an agreement by John L. Ashurst to assign to the company the patent for the improvement which he then had in contemplation, whenever it should be issued to him.

We have searched the record in vain for any reliable evidence tending to prove the alleged agreement among all the members and stockholders of the proposed corporation in relation to assigning to it all patents for improvements in grain drills subsequently obtained by them. Much less is there any evidence of that clear and convincing character which courts of equity always require, when called upon to decree the specific performance of contracts.

The evidence of the alleged agreement by Ashurst to assign to the corporation the patent for the improvement upon which he was then experimenting, when issued to him, is conflicting. The testimony of Ashurst is clear, circumstantial and positive that no such agreement was made,—and that there was nothing said between him and the other members of the corporation in relation to such assignment, until after the patent had been issued, which was several months after the organization of the corporation. The testimony of Rhodes and the other stockholders, on the other hand, is uncertain and to a very great extent quite unsatisfactory. No one attempts to state the time, place or occasion when an agreement, such as is alleged, was concluded or entered into, or to give, either literally or in substance, the language employed by the parties in forming it or the terms agreed upon. Most of their testimony consists of a statement of their understandings, inferences and conclusions, and comes far short, in our opinion, of furnishing legal evidence of a consummated contract. It seems clear that if such agreement was entered into at all it was not in writing, although Rhodes appears to think that the contract which was lost, and in place of which the

agreement of January 3, 1885, was executed, was an agreement to assign the patent. As we have already remarked, however the preponderance of the evidence clearly shows that its terms were substantially the same as were those of the substituted contract, and that it was therefore merely a license to the corporation to use the patent, rather than an agreement to assign it. The proper proof of an oral contract is the testimony of witnesses who were present when it was entered into, and who are able to give, either literally or in substance, the language employed by the parties in forming it, and statements of witnesses as to their understandings or conclusions in relation to the contract, or as to what its terms were, if competent as evidence for any purpose, certainly come far short of proving it with the certainty and clearness required by the rules governing the specific enforcement of contracts by courts of equity.

It may also be noticed as a significant circumstance that, while the agreement between the promoters of the proposed corporation, embodying the understanding between themselves and between them and the bank upon which the corporation was to be organized, provided specifically for an assignment by Ashurst to the corporation of the Blunt patents for the State of Kansas, no provision whatever was made in relation to the patent which he then expected to take out for the improvement he was then inventing. If the assignment of that patent was a part of the consideration, and as is now insisted, the principal consideration upon which the promoters agreed to form the corporation, it is, to say the least, remarkable that no provision was made in relation to it in the preliminary contract.

Furthermore, when the agreement of January 3, 1885, was drawn, and for a considerable time prior thereto, there seems to have been a controversy between Ashurst and the other stockholders in relation to the assignment of the patent to the corporation, but when that agreement was drawn, it was accepted by the other stockholders, although, as they now

claim, reluctantly, and was by them placed on record in the Patent Office, and was acted upon by them, and from that time up to the date of the filing of the original bill, which was almost six years, no steps were taken to assert the right of the corporation to an assignment of the patent, that period being sufficient to bar an action at law, and in most cases to bar the right to relief in equity, on an oral contract. Such delay, after accepting an instrument which amounted only to a license, is of itself evidence of considerable strength that a license was all Ashurst has agreed or consented to give, even if it does not constitute a sufficient and effectual bar by limitation of the complainants' right to relief.

In view of all these considerations, we are of the opinion that the Circuit Court properly held that the agreement by Ashurst to assign the patent to the corporation, as alleged in the original and amended bills, was not proved, and in dismissing those bills for want of proof of their material allegations.

Of the errors assigned upon the decree under the cross-bill, the first to be noticed is the one calling in question that part of the decree which vacates the license by Ashurst to the Havana Press Drill Company to use the improvement covered by patent numbered 297,961. The grounds upon which the cancellation of the license was decreed were (1) that the license was a mere gratuity, and that the implied conditions of the gift, and the motives or reasons which induced it, had wholly failed, and (2) that Ashurst had been "forced out of the company," within the meaning of that phrase as used in the instrument by which the license was granted, and consequently that by the terms of that instrument, the rights granted had reverted to Ashurst.

In view of all the evidence, we think the conclusion a fair one, that the license was a mere gift or gratuity. As has already been seen, it is not shown that there was any agreement on Ashurst's part to assign the patent, and there is an equal want of evidence of an agreement to license, until the first

instrument by which a license was granted was executed, and that was after the patent was issued and several months after the corporation was organized. It is true the evidence tends to show that, after the patent was received by Ashurst, Rhodes importuned him to assign it to the corporation, claiming that, as he was a stockholder and interested in the success of the business, he ought to do so, and that on Ashurst's refusal to make the assignment, Rhodes declared his determination to go no further with the enterprise, and to pay no more money on his subscription, unless the assignment should be made, and that Ashurst thereupon, to prevent an abandonment of the enterprise by Rhodes, executed the first instrument granting to the corporation a license to use the patent. But there is nothing in this showing that the license was not after all a gratuity. The consent of Rhodes to proceed with the enterprise which was thereby obtained, constituted no valuable consideration for the license. Rhodes did only what, by his previous subscription to the capital stock of the corporation he had become legally obligated to do, and the performance of his existing legal obligation was and could be no consideration to Ashurst for the license.

We are also of the opinion that the court was justified in holding that Ashurst had been "forced out of the company." The sense in which this phrase was used in the instrument granting the license is not altogether clear, but it is manifest that it could not have been used as meaning the legal expulsion of Ashurst from membership in the corporation, because as his membership depended upon the ownership of shares of stock, it was not and could not have been in the power of the other members to exclude him from membership, so long as he was the owner of shares of stock. The phrase, when interpreted in the light of surrounding circumstances, must be understood as referring to exclusion from the active and responsible management of the business of the corporation, and from the beneficial enjoyment of the anticipated profits of the enterprise.

True, he was not degraded from the office of manager of the corporation by any formal action of the other stockholders or officers, and his vacation of his position was in a certain sense voluntary, still, if his testimony on that subject is to be believed, the conduct of Rhodes was such as to render his authority as manager merely nominal, and to make it impossible for him to occupy that position with self-respect. His vacating his office and accepting a subordinate position, and his subsequent resignation of that, can not be relieved of the element of moral coercion, merely because he was not actually or physically expelled therefrom.

But subsequently Rhodes, after having obtained the title to all the capital stock except the $6000 deposited as collateral to Ashurst's two notes, and which, being in the hands of the company, was under Rhodes' control, prevailed on the company to abandon the further prosecution of its business, and to assign and turn over to him all its property and assets, including the license in question, to be held and managed by him for his own use and benefit. It is difficult to see how Ashurst could have been more effectually "forced out of the company."

It is further contended that the decree, so far as it awards an accounting as against the Stoddard Manufacturing Company is erroneous, for the reason that there is no privity between the complainants in the cross-bill and that company, and also that the case, so far as it involves an attempt to reach the royalties and license fees paid or payable under the contract between Rhodes and the Stoddard Manufacturing Company, necessarily involves questions arising under the Patent Laws of the United States, over which the Federal Courts have exclusive jurisdiction. These questions, although involving somewhat different considerations, will be considered together.

It will not be disputed that, in all cases brought to recover damages for the infringement of patents, or to restrain such infringements, the jurisdiction of the Federal Courts is exclu-

sive.   See sections 627, 711 and 4921 of the Revised Statutes of the United States.   This however is in no sense a case of that character.   The complainants in the cross-bill are not seeking to recover damages for an infringement of the patent, but to charge Rhodes and the Stoddard Manufacturing Company as trustees of certain moneys paid or payable as royalties or license fees for the use of the patent, under the license granted by Ashurst to the Havana Press Drill Company. Rhodes, after obtaining an assignment of that license to himself, made use of it in such way as to derive therefrom the royalties and license fees in question, and the cross-bill seeks to reach the fund thus created.

Of course it must be admitted that the cross-bill proceeds upon the theory that the assignments of the license by the Drill Company to Rhodes and by him to the Manufacturing Company were tortious, and constituted a use of the license which neither the Drill Company nor Rhodes had a right to make, but they having made that use of it and having realized profits therefrom, those profits, upon the plainest principles of equity, belong to the owner of the patent, and neither Rhodes nor the Manufacturing Company will be permitted to set up the tort committed in making an unauthorized use of the license, to shield themselves from liability to account for the royalties thus earned.   The principle involved does not seem to differ essentially from that which ordinarily obtains where one person makes an unauthorized and tortious use of the property of another and thereby realizes profits.   While it is true that in such cases the owner may, if he chooses, disaffirm the transaction and sue as for a tort, still he may, if he sees fit, waive the tort and recover the money received in an action for money had and received.

If a bailee, having property deposited with him merely for safe keeping, sells it, the owner may, if he pleases, treat the sale as a nullity and recover the property from the purchaser, but he may affirm the unauthorized sale and recover from the

bailee the price received. In the present case, the Drill Company had no authority to assign the license for two reasons, (1) because the license to it did not run to its assigns, and was therefore merely personal, and, (2) before it attempted to make the assignment, the license itself, by the terms of the instrument by which it was granted, had reverted to the licensor. But while this is true, the complainants in the cross-bill have seen fit, as they had an undoubted right to do, to affirm the assignments of the license, so far as relates to such use of the patent as has already been made, and seek to recover the royalties and license fees paid and payable under them. This is merely an attempt to enforce rights arising *ex contractu,* and is clearly within the jurisdiction of the State Courts. See *Marsh* v. *Nichols,* 140 U. S. 344; *Hartell* v. *Tighlman,* 99 id. 547; *Manufacturing Co.* v. *Hyatt,* 125 id. 146; *Store Service Co.* v. *Clark,* 100 N. Y. 285.

Of course, if the complainants had elected to treat the assignments of the license as void, as they might have done, very different questions would have been presented. In that case, the use by the Manufacturing Company of the improvement covered by the patent would have been simply an infringement, and would have presented a matter which would have been within the exclusive jurisdiction of the Federal Courts. But by affirming the assignments of the license and seeking to recover the accrued license fees, all questions of infringement are eliminated, and no case is made upon which the validity even of the patent can be contested. The licensee, in a suit to recover the royalties agreed to be paid, will not be permitted to contest the validity of the patent. There is no warrant of such validity implied in a license given thereunder, and proof of its invalidity is no defense to a suit for the promised royalties. *Birdsell* v. *Perigo,* 5 Blatch. 251; *Pope Manfg. Co.* v. *Owsley,* 27 Fed. Rep. 100; *Bartlett* v. *Holbrook,* 1 Gray, 118.

In view of what has been said, it can scarcely be contended that there is any such want of privity between the complain-

ants and the Manufacturing Company as should preclude the entry of a decree requiring the company to account in this suit for unpaid royalties, and to pay them over to the complainants who are equitably entitled to receive them. There is the same privity which always exists when one person has in his hands money which *ex equo et bono* belongs to another. The company has been using the complainants' patent under such circumstances as entitle the complainants to the royalties in place of the immediate assignor of the license, and it seems very clear that the company is under an equitable liability to account to the parties entitled to receive the money.

But it is urged as an objection to the decree, that the license from Rhodes to the Manufacturing Company, under which the royalties in question became payable, covered two other patents for improvements in grain drills previously obtained by Rhodes, and that the royalties agreed to be paid were for the use of the three patents, without any apportionment of the royalties payable under each patent. This fact undoubtedly will make it more difficult to determine the precise amount of the agreed royalty properly chargeable for the use of the complainant's patent, but the difficulty of ascertaining the equitable rights of parties does not deprive courts of equity of jurisdiction, or excuse them from the duty of ascertaining and protecting those rights. The present record fails to show the relative importance and value of the three patents, but that is a question which the court below is capable and has the means of investigating, and it will be its duty to make the apportionment upon equitable principles, and award to the complainants such portion of the royalties derived from the use of their patent as under all the circumstances shall appear to be just and equitable.

We are of the opinion that the decree of the Circuit Court was just and proper, and the judgment of the Appellate Court affirming it will be affirmed.

*Judgment affirmed.*