ACME CHAIR AND METAL CRAFTS COMPANY, Appellant, vs. NORTHERN CORRUGATING COMPANY, Respondent.

*May 12—October 11, 1932.*

For the appellant there were briefs by *Silverwood & Fontaine* of Green Bay, attorneys, and *O'Reilly & De Laney* of Chicago of counsel, and oral argument by *T. P. Silverwood*.

For the respondent there were briefs by *Jaseph, Young & Everson* of Green Bay, and oral argument by *E. L. Everson*.

The following opinion was filed June 20, 1932:

OWEN, J. This action was originally brought by one J. J. Schmitt to recover royalties alleged to be due him under the terms of a contract entered into by said Schmitt and the defendant Northern Corrugating Company, by the terms of which the said Schmitt guaranteed to Northern Corrugating Company the exclusive right to manufacture a folding chair which had been invented by said J. J. Schmitt and upon which Schmitt's application for a patent was then pending in the patent office. Subsequent to the commencement of the action Schmitt assigned his claim to the Acme Chair and Metal Crafts Company, which thereafter was substituted as party plaintiff in this action.

It appears that Schmitt owned or was interested in a small manufacturing establishment at Algoma, Wisconsin. He invented a folding chair and made application to the United States patent office for a patent thereon February 26, 1929. His application set forth thirteen claims. After filing this application he concluded to proceed with the manufacture of the chair in his small manufacturing establishment at Algoma. It seemed convenient for him to have

some of the parts of this chair manufactured and delivered to him. Learning that Schmitt desired the manufacture of 100,000 backs and 100,000 lugs to enable him to produce the chair, the defendant Northern Corrugating Company of Green Bay sent its sales representative, one H. W. Ashton, to interview Schmitt at Algoma with a view of securing the contract. Upon examining the chair, Mr. Ashton was impressed with its sales appeal, and took up with the Northern Corrugating Company the question of securing the right from Mr. Schmitt to manufacture and market the chair. To this end negotiations with Mr. Schmitt were opened by the Northern Corrugating Company. Mr. Ashton, and Mr. Krueger, the president of the company, made one or two trips to Algoma for the purpose of interviewing Mr. Schmitt, and Mr. Schmitt made two or three trips to Green Bay in pursuance of the same negotiations. These negotiations finally culminated in a written contract between the parties whereby Schmitt guaranteed to the Corrugating Company the exclusive right to manufacture the chair, without restriction, in consideration of certain royalties which the Corrugating Company agreed to pay Schmitt for the privilege. This contract recited that Schmitt had made application for patent on said chair, "and such application is now pending in the United States patent office, being patent application No. 342708," and that the party of the first part (Corrugating Company) "is desirous of obtaining the sole right to manufacture and sell such chair under the application pending, and under any patent hereinafter to be granted to the said Joseph J. Schmitt, his heirs or assigns, under such application, upon the terms and conditions hereinafter specified."

The Northern Corrugating Company entered upon the manufacture and marketing of the chair and paid Mr. Schmitt royalties to the amount of $2,500. After about three months' operation under the contract, the Corrugat-

ing Company claimed that there were other chairs on the market with which their chair was coming into competition, embodying mechanical principles similar to the Schmitt chair. The Northern Corrugating Company then notified Mr. Schmitt of such situation and told him to take action to protect them, and they paid no further royalties, although they proceeded with the manufacture of the chair and, at the time of the trial, in October, 1931, had marketed at least 350,000 chairs.

As stated, this action was brought to recover royalties due Mr. Schmitt or his assignees under the terms of the contract. The defense was that the Northern Corrugating Company was induced to enter into the contract by virtue of the false and fraudulent representations made by Schmitt that his claim for a patent had been allowed by the patent office prior to the consummation of the written contract and that Mr. Schmitt was able to give to the Northern Corrugating Company the exclusive right to manufacture folding chairs embodying the mechanical principles upon which the Schmitt folding chair was based. The trial court found that the Northern Corrugating Company was induced to enter into the contract by reason of such false and fraudulent representations, that the contract was, accordingly, void, and denied the plaintiff any recovery.

Appellant challenges the sufficiency of the evidence to support the finding that the Northern Corrugating Company was induced to enter into the contract upon which the action is based by reason of the false and fraudulent representations made by Schmitt that his application for patent upon the chair had been allowed by the patent office, and this challenge imposes upon us the duty of investigating the record to ascertain whether the findings are supported by the evidence. We enter upon this undertaking with the principle in mind that the finding of the trial court upon this question cannot be disturbed unless it is against the great

weight and fair preponderance of the evidence. It will assist in weighing the evidence if we have in mind certain of the general and conceded facts in the case.

The Northern Corrugating Company has been in the sheet-metal business for thirty years and, according to the president of the company, has had experience in regard to patents and obtaining patents, and in regard to the effect of a patent when obtained. Mr. Krueger, the president, showed familiarity with practices obtaining in the patent office, as revealed by the following question and answer:

"Q. Now in your previous experience with the application for and issuance of patents, did you at that time know that one stage of that proceeding was the allowance of the claims?

"A. Well, that's understood, that as soon as the claims are allowed the patents of course will be issued very shortly afterwards. It is a matter of routine in the patent office,— after the claims are allowed they are just as good as issued. The remainder of the process to my knowledge was simply the clerical routine matter."

This sufficiently indicates that the Northern Corrugating Company was negotiating in a field in which it had considerable familiarity and that it was not the easy victim of fraud and misrepresentation within that field. Its long business experience and its familiarity with patents, patent rights, and the practices of the United States patent office placed it in a position where it was able to deal at arms' length with Mr. Schmitt.

It further appears that Mr. Schmitt was not the moving party in bringing about the final consummation of the written contract between the parties. Mr. Schmitt had concluded to manufacture and market the chair himself. When Mr. Ashton saw the chair he was immediately impressed with its sales possibilities. He laid the matter before the officers of the company, and the evidence conclusively shows that the Corrugating Company was the aggressor in the matter of

pressing negotiations looking to the acquirement of such rights as Mr. Schmitt had to market the chair. As already stated, Mr. Schmitt's application for a patent was filed February 9, 1929. His application set forth thirteen claims for a patent. Now a folding chair in 1929 was not in and of itself a novelty. Folding chairs had been in general use prior to that time, and it must be assumed that the defendant knew of this fact. It would be most unusual to secure a patent on a folding chair as an entity. Any patentable feature must be special, and relate to peculiar devices and combinations employed in the structure of the chair. It is absolutely certain that Schmitt's application for patent contained thirteen different claims. This was known to the defendant because, according to the admissions of its officers, Schmitt showed them his application for a patent at Algoma. Its claim of fraud is based upon the fact that at this time Schmitt told them that his claim for patent had been allowed. They knew that his application contained thirteen claims. They do not testify that he represented that any particular claim had been allowed or that he represented that all thirteen claims had been allowed. Their testimony is that he simply represented that his application for a patent had been allowed. The evidence that this representation was made by Schmitt rests largely if not exclusively in the testimony of Ashton, the salesman, and Krueger, the president. Mr. Martin, the vice-president, who was present at the time of the signing of the written contract, testified that Schmitt made no claim that his patent had been allowed. He testified:

"We all understood perfectly that patent application was pending and that his patent had not as yet been allowed. About the only statement that was made was, that patent was pending and would soon be allowed. Something of that kind. That is as I understand it. I do not know whether there was any specific reference made to any number of claims, and it seems to me that he mentioned that he had

signed definite claims on the chair, and that they were pending, and that the patent was pending and he thought it would soon be allowed. He was making no claim that the patent office had finally passed on it, or anything of that kind. I understand that he was claiming the right to make the chair because he had application pending for the patent just as the contract provided."

Mr. Schmitt denied that he represented that any of his claims had been allowed. The recitals in the written contract negative the idea that it was based upon the assumption that any of the claims for a patent had been allowed. That contract recites:

"That whereas, the said party of the second part has perfected a certain folding chair, and has made application for a patent thereon, and such application is now pending in the United States patent office, being patent application No. 342708; and whereas, the party of the first part is desirous of obtaining the sole right to manufacture and sell such chair under the application pending, and under any patent hereinafter to be granted to the said Joseph J. Schmitt, his heirs or assigns, under such application, upon the terms and conditions hereinafter specified," etc.

This recital in the contract is but a true statement of the situation as it then actually existed. The application for the patent had been filed, but it had not been allowed; neither had any claim made in the application then been allowed. It would seem that if Schmitt was then claiming that any number of his claims had then been allowed, it would have been most natural to recite that fact in the contract. The fact that the contract contains no such recital raises an inference of no slight weight that no such representation had been made.

The evidence shows that the Northern Corrugating Company incurred some expense in equipping its plant for the manufacture of this chair. It also shows that before the contract was entered into, Ashton went to Chicago and made a survey of the field to enable him and the Corrugat-

ing Company to form an opinion with reference to the sales prospects of the Schmitt chair. Apparently the judgment thus formed was to the effect that the Schmitt chair embodied elements so far superior to that of any other folding chair on the market that it could afford to invest in the venture without making any further investigation concerning the probabilities with respect to the final granting of Schmitt's application—a judgment fully confirmed by subsequent events. During the two years that intervened between the signing of the contract and the trial of the case the Northern Corrugating Company manufactured and marketed more than 350,000 of these chairs. True, it appeared in evidence that prior patents had been issued relating to folding chairs, and representatives of the manufacturers of such chairs testified in the case. The testimony showed that there were 200 of one of such chairs sold during the three-year period succeeding July 9, 1926; that there were 1,500 of another chair sold during the period succeeding January 1, 1927, and that there were 40,000 of another chair sold during the period succeeding May 16, 1928. It does not appear how many of these chairs were sold after the Schmitt chair was placed on the market. But if all of these chairs were sold after the Schmitt chair was placed on the market, the competition certainly was not ruinous,—if it was of particular consequence.

Another very significant circumstance is that the defendant requested the plaintiff to insert a condition in the contract that he would protect it from infringement or competition. This he absolutely refused to do and, according to the defendant's witnesses, he gave them just ten minutes to sign the contract, as it was then prepared, and they availed themselves of the opportunity, all of which strongly indicates that Schmitt was not the aggressor in bringing about the execution of this contract, that he was making no concessions to secure its execution, that the Northern Corrugat-

ing Company fully appreciated the sales possibilities of the chair, and that it was the Corrugating Company that was overanxious to secure the contract upon whatever terms. These considerations bear strongly upon the probabilities of whether Schmitt represented that his application for a patent had been allowed for the purpose of inducing the Northern Corrugating Company to enter into the contract. It is true that the testimony of Ashton and Krueger is to that effect. The testimony of Martin, however, does not support such a conclusion. The testimony of Schmitt absolutely negatives any such representation, while every circumstance in the light of which such testimony should be weighed indicates that the Corrugating Company was not induced to enter into the contract by any such representation. If we felt that a decision of the case must be placed upon the fact that such representation had been made, we should find it exceedingly difficult to permit the finding of the court that it was made to stand.

While the doctrine of *caveat emptor* has been considerably relaxed in its application, the principle has by no means been renounced. The defendant contends that it was induced to make the expenditures for the installing of necessary equipment to produce the chair by reason of the fact that the plaintiff represented to it that his patent had been allowed. If the question of whether the patent had been allowed was deemed a matter of importance by the defendant before making the investment necessary to properly equip its plant, it had means readily at hand by which such representation could have been verified. Granted that, as contended by the defendant, this information could not have been obtained by making inquiry at the patent office, it is certain that Schmitt must have had advices from the patent office upon which such representation, if made, was based. Instead of relying upon the unsupported representation of

Schmitt in this behalf, the defendant's officers could have simply asked him to disclose to them the evidence in his possession of such fact. This it entirely failed to do, and proceeded with the equipment of its plant, and the incurring of expense necessary to that end, confiding entirely, as it claims, in the unsupported statement of Schmitt when it was easily within its power to verify such statement, if it was in fact made. As said in *Plantikow v. Wolk,* 190 Wis. 218, at p. 222 (208 N. W. 922):

"It is true that, ordinarily, false representations such as were made by the defendant, if relied upon by the other party to his damage, where no opportunity is afforded for an individual inspection or inquiry, raise a jury issue; but the facts in the instant case bring it within a well-known and recognized exception. If an exception is to be recognized in any case, the instant case comes under such exception."

It seems plain that, whether the representation in question was made, the defendant failed to exercise that care for its own protection which was easily within its power to exercise, and, under all the circumstances, it was not justified in relying upon such a representation, if made.

This conclusion effectually disposes of the case and makes it unnecessary to consider other questions raised. Our conclusion that the doctrine of *caveat emptor* is applicable to the situation destroys any defense based upon fraud as fully and effectually as though no fraudulent representation had been made. The judgment should go for the plaintiff. The amount of recovery to which he is entitled, however, has not been ascertained, and the judgment must be reversed and the cause remanded with instructions to the lower court to render judgment in favor of the plaintiff for such amount as it shall be ascertained the plaintiff may be entitled to under the terms of the contract. This may require further testimony and an accounting, but any further testimony in the

case should be limited exclusively to the amount of damages to which plaintiff is entitled under the terms of the contract.

*By the Court.*—Judgment reversed, and cause remanded for further proceedings in accordance with this opinion.

The following opinion was filed October 11, 1932:

OWEN, J. (*on motion for rehearing*). A motion for rehearing directs attention to the fact that this court did not consider the defense of total failure of consideration which was found by the trial court and urged in respondent's brief. This contention was so palpably unsound, except as taken in connection with the defense of fraud, that the court deemed it immaterial when all question of fraud was read out of the case. However, it is urged upon a motion for rehearing that, fraud or no fraud, there was a total failure of consideration for the royalty contract because of existing patents covering many of the features involved in the chair and upon which Schmitt had made claims for patents which were disallowed. We are satisfied that this contention is entirely without merit.

The genius of Schmitt had created a valuable article of commerce which he proposed to manufacture and place upon the market. The Northern Corrugating Company learned of this fact and satisfied itself that the manufacture and distribution of this chair would afford a profitable venture. It desired to acquire the exclusive right to manufacture the chair. This right, so far as Schmitt had the power to give it, was a valuable right. At this time it is doubtful if it had the information necessary to enable it to manufacture the chair. Schmitt had refused to send it one of his chairs for inspection. The contract prevented Schmitt from entering into the manufacture of the chair. As already seen, the contract was not contingent upon the allowance of Schmitt's

various claims for patents. The Corrugating Company wanted the immediate right to manufacture the chair. This it got and this was all for which it contracted.

It is well settled by much uniform authority that the licensee of a patent right may not refuse to pay royalties or license fees, because the patent is subsequently declared to be void, which have accrued up to the time of such declaration. Among the authorities that may be cited in support of this proposition are *Marsh v. Harris Mfg. Co.* 63 Wis. 276, 22 N. W. 516; *Federal Electric Co. v. Flexlume Corp.* 9 Fed. (2d) 647; *Barber Asphalt Paving Co. v. Headley Good Roads Co.* 284 Fed. 177; *In re Michigan Motor Specialties Co.* 288 Fed. 377; *Thompson Spot Welder Co. v. Oldberg Mfg. Co.* 234 Mich. 317, 207 N. W. 828; *Havana Press Drill Co. v. Ashurst,* 148 Ill. 115, 35 N. E. 873; *U. S. v. Harvey Steel Co.* 196 U. S. 310, 25 Sup. Ct. 240.

The doctrine seems to be that the licensee in a suit to recover the royalties agreed to be paid will not be permitted to contest the validity of the patent. There is no warrant of such validity implied in a license given thereunder, and proof of its invalidity is no defense in a suit for the promised royalties. By analogy, as well as upon principle, the licensee of an unpatented device stands upon exactly the same ground. He enters into such a contract upon the belief entertained by him that the genius of another has produced an article of value, and that the exclusive right to manufacture it, so far as it can be given by the inventor, is something of value for which he is willing to pay. The mere fact that others might have the legal right to manufacture it does not deprive the license from the inventor of consideration. This is the view taken by at least two courts. In *Ingraham v. Schaum,* 157 Pa. St. 88, 27 Atl. 404, the supreme court of Pennsylvania had under consideration an action to recover royalties agreed to be paid on an unpatented device

for which a patent was subsequently refused. Speaking of the liability of the licensee the court says:

"They knew that it was an unpatented device on which they were to pay royalties, and that their liability to pay them was not contingent on the result of the application for a patent. We have, then, the case of parties who, having used and made profits from an unpatented device, under their agreement with the inventor of it, refuse to pay him the royalties therein stipulated for, on the sole ground that he failed to secure a patent for his invention. The consideration of their agreement to pay the royalties was the right granted to them, and this right they have exercised and enjoyed without molestation or threat of interference from any quarter, and as fully and exclusively as they could have done if a patent had been obtained. It may be fairly assumed, as it is not denied, that the witch motion, although not patented, is a useful device, and that the price for which they sold the machines containing it included the royalty they had agreed to pay. This witch motion, whether patentable or not, was devised by the appellant, and the appellees acquired from him, in consideration of their agreement to pay the stipulated royalty, the right to build it, together with the knowledge that enabled them to do so. As they do not deny that they have exercised the right and used the knowledge so obtained with as much profit to themselves as they would have secured if the patent had been granted, nor allege that they have sustained loss or incurred liability by the refusal of it, their claim to be released from their promise to pay royalties is against equity and good conscience, as well as in conflict with the plain provisions of their contract." To the same effect is *Myers v. Gerhardt*, 344 Ill. 620, 176 N. E. 713.

We see here no failure of consideration. The Corrugating Company got exactly what it paid for and hoped to acquire. It got the exclusive right from the vendor to manufacture this chair. It has not been disturbed or interfered with in the exercise of that right. It has not been ejected from the rights and privileges thus acquired. Schmitt has at all times refrained from manufacturing the chair. No

one has undertaken to manufacture the same chair. The competition it has met from similar chairs has been inconsequential. At no time did it repudiate the contract. It has enjoyed the rights and benefits it sought to acquire and it should now pay that which it agreed to pay.