**In re NORCOR MFG. CO.**

**SCHMITT v. NORCOR CO. et al.**
No. 6935.

Circuit Court of Appeals, Seventh Circuit.
Jan. 24, 1940.

Rehearing Denied March 2, 1940.

Seymour N. Cohen and Ralph M. Snyder, both of Chicago, Ill., and Thomas P. Silverwood, of Green Bay, Wis., for appellant.

J. Emmet McCarthy, of Marinette, Wis., for appellees.

Before SPARKS, MAJOR, and KERNER, Circuit Judges.

MAJOR, Circuit Judge.

This is an appeal from an order of the District Court entered January 17, 1939, with reference to certain claims filed in a reorganization proceeding under Section 77B of the Bankruptcy Act, 11 U.S.C.A. § 207.

The claims involved are those of appellant Schmitt, appellee Norcor Company, and appellee Martin Carlstein. A Special Master recommended allowance of the Schmitt claim in the sum of $70,331.58, which was reduced by the court and allowed in the sum of $50,514.67. The claim of the Norcor Company was recommended for allowance and allowed by the court in the sum of $65,016.73. Appellant Schmitt concedes this claim in the sum of $13,331.13. The claim of appellee Carlstein was recommended for allowance in the sum of $6,927.14, which recommendation was approved by the court. It is urged that this claim should have been disallowed in its entirety, and in any event, should not have been allowed in an amount in excess of $750.

The claim of appellant Schmitt is predicated upon a written contract entered into June 3, 1929 with the Norcor Manufacturing Company (formerly Northern Corrugating Company), the debtor corporation (also referred to as the "Manufacturing Company"). By the terms of this contract, the Manufacturing Company agreed to pay Schmitt a certain stipulated royalty for the exclusive right to manufacture and sell chairs, on which Schmitt had pending an application for a patent. The contract was to run for a period of three years, or until June 1, 1932, and under certain conditions was to continue for an additional year, or until June 1, 1933. The conditions mentioned were complied with and there is no dispute but that the contract was in effect until the latter date. The rights of the parties arising from this contract have been the source of much litigation. On three occasions the matter has been before the Supreme Court of Wisconsin. Acme Chair & Metal Crafts Co. v. Northern Corrugating Co., 209 Wis. 8, 18, 243 N.W. 415, 244 N.W. 582; In re Norcor Mfg. Co., 223 Wis. 463, 271 N.W. 2. Also before this court In re Norcor Mfg. Co., 7 Cir., 97 F.2d 208. A detailed statement of the facts may be found in those cases.

On June 28, 1932, Herman W. Krueger, the principal stockholder, President and Director of the Manufacturing Company, and other directors of said corporation, in the State Court of Wisconsin, confessed the insolvency of said corporation and agreed to the appointment of receivers. They were appointed with authority to carry on the business and, all

creditors, including Schmitt, were enjoined from taking further action on their claims. By the decisions of the Supreme Court of Wisconsin, supra, Schmitt was adjudicated to have a valid claim antedating the receivership in the amount of $45,812.30, and $4,702.37 against the receivers, or a total claim of $50,514.67, the amount allowed by the District Court in the instant matter.

This adjudication included the amount due Schmitt under the terms of the contract from June 1, 1929 until June 1, 1933. While, by the terms of the contract, it was automatically extended the fourth year, June 1, 1932 to June 1, 1933, it is conceded there is nothing in the terms of the contract by which it was expressly continued subsequent thereto. Thereafter, however, the receivers continued the manufacture of the product described in the contract, which constituted the major portion of its business. During this period, as before, the receivers enjoyed the sole and exclusive right in this respect, and also during this time Schmitt was enjoined from prosecuting any claim for such use.

The amount of the claim in dispute, $19,816.91, recommended for allowance by the Special Master, but disallowed by the court, is the sum which Schmitt claims as royalty for the use of his invention subsequent to the expiration of the contract. The position of appellees is to the effect that, after the expiration of the contract, Schmitt was not entitled to royalties for the use by the receivers of his invention. It is argued his claim in this respect was based upon infringement and, that the Special Master had no jurisdiction to consider such a claim. The Master, in deciding against this contention, said: "I am of the opinion that this is fair and equitable and that the receivers were operating under an implied contract to pay the same. * * * I find that after the expiration of the fourth year of the Schmitt contract, that claimant is entitled to 5% of the invoice of the chairs made and sold by the receivers."

As authority for this conclusion, the Master cites In re Michigan Motor Specialties Co., D.C., 288 F. 377, Schiff v. Hammond Clock Co., 7 Cir., 69 F.2d 742, Schall v. Camors, 251 U.S. 239, 251, 40 S.Ct. 135, 64 L.Ed. 247. By reason of these authorities and the circumstances presented, we are satisfied the Master reached the proper conclusion.

[1] We do not think the opposing contention is sustained by any authorities to which our attention has been called, and certainly it is not sustained by logic or equitable consideration. When the receivers were appointed in the State Court, they retained as active manager the same person who had theretofore acted in that capacity and who was also the principal stockholder and President of the company. They had knowledge of the contract—in fact, worked and complied with its terms until its expiration. Prior thereto, Schmitt had been enjoined from taking any action looking toward the protection of his rights. The receivers continued, after the expiration of the contract, to manufacture the product the same as they had before. We see no reason why he should not be entitled to reasonable compensation for the use of his property, his invention. No question of infringement was involved—the estate is liable under the circumstances by reason of an implied contract.

The Master, in determining the reasonable compensation, properly took into consideration the five per cent royalty agreed to be paid under the contract. There seems to be no occasion, however, to consider just how and in what manner the Master reached his decision as to the amount allowed for the reason that, under the contentions presented, the reasonableness of the allowance is not in question. It follows that the court erred in sustaining objections to the Master's report as to this claim and, that the claim should have been allowed as recommended by the Master.

We shall now consider the respective contentions with reference to the claim of the Norcor Company (not to be confused with the Norcor Manufacturing Company). Few, if any, of the facts in connection with this claim have been related in the opinions of the Supreme Court of Wisconsin, nor in the opinion of this court to which we have heretofore referred. It seems important, therefore, to give a more detailed statement of the facts than was necessary in connection with the Schmitt claim.

Krueger, as stated, was the principal stockholder, President, Director and Manager of the Norcor Manufacturing Com-

pany. About ten months subsequent to the appointment of the receivers in the State Court, Krueger, in the presence of one Spiegel, his plant superintendent, employed one Otto P. Lehner, an attorney, for the purpose of reorganizing the debtor corporation. Lehner was furnished with a list of creditors, financial statements and other data pertinent to the situation. At the suggestion of Lehner, Krueger assigned his controlling stock of the debtor corporation to Frank Cota and, a written agreement was entered into between Krueger and Lehner. Neither Krueger nor Lehner was able or willing to produce this contract or a copy thereof before the Master, and its provisions are a matter of dispute. Almost immediately thereafter, Lehner commenced sending letters to the debtor's numerous creditors, representing that a number of business men were interested in effecting a reorganization of the debtor, and offering to purchase their claims at from ten per cent in cash to thirty per cent debentures, depending upon the amount of the claim. This offer was followed by numerous other letters signed by Lehner as "Attorney for Reorganizers" or as "Agent," urging the creditors to accept. Some of the creditors wrote to Krueger in reference to their claims, and such letters were turned over to Lehner for reply. Lehner admitted at the hearing that the reorganization committee, which he purported to represent, consisted of Krueger and Spiegel.

Lehner conceived the idea of incorporating the Norcor Company, and articles of incorporation were issued October 7, 1933. This was referred to by Lehner as a "syndicate" and as "a nucleus in the reorganizing proceeding," and again, as "a step in the reorganization and rehabilitation of the Norcor Manufacturing Company." The controlling stock of the Manufacturing Company theretofore owned and assigned by Krueger to Frank Cota, was turned over to the Norcor Company in exchange for its stock.[1] The capital stock

of the latter consisted of 2,000 shares of common and 250 shares of preferred. Eighteen hundred shares of the former were issued to Lehner "as trustee." At the time of the hearing before the Master, there remained in Lehner's name as trustee, 1,600 shares of the common and 121 shares of the preferred stock. Cota was President, and Lehner Secretary and Treasurer of the new corporation. These two, together with three others, constituted the Board of Directors, each of whom was given 50 shares of stock, although the certificates remained in the stock book in the possession of Lehner. The Norcor Company was engaged in no business, had no bank account and no employees except Lehner. The record is convincing that, in substance, Lehner himself was the corporation. It was under his domination and control entirely.

Lehner's testimony is to the effect that Krueger had no interest in the stock which he held as trustee, although we are unable to find any consideration which Krueger received for stock of the Norcor Manufacturing Company, delivered by him to Cota, nor for that matter, is there any evidence that Lehner paid anything for the Norcor stock issued in his name.

After the incorporation of the Norcor Company, Lehner continued by letter to impress upon the creditors the importance of accepting the offer made for their claims. The offer was accepted by many and assignments made to numerous parties, including Lehner, his wife, Winfred Krueger, a son of Herman W. Krueger, Frank Cota, and to other individuals and concerns with which Lehner was closely connected and associated. One hundred and eighty of such claims were reassigned to the Norcor Company, the total amount of which was $65,016.73, and it was for this amount the claim in controversy was allowed in favor of the Norcor Company. It appears that the actual amount paid in cash and debentures on account of these claims was the sum of

---

[1] During oral argument a motion was presented by appellant for leave to file a certified copy of a complaint, filed in the State Court of Wisconsin January 2, 1940, by Herman W. Krueger against Otto P. Lehner and the Norcor Company, wherein the defendants (appellees here) were charged with obtaining plaintiff's stock in the Norcor Manufacturing Company, by fraud and deception. It was also charged that Lehner had been disbarred as an attorney. The motion was allowed without objection on the part of counsel for appellees. In fact, such counsel, during oral argument, frankly stated that, in view of the disclosure thus made, he did not care to argue the merits of the Norcor Company claim. While we have read the charge as made in this complaint, our decision is based upon the record as originally presented.

$13,331.13. The record contains the statement by Krueger under date of December 15, 1933: "We have the assignments of all the creditors but three, out of 184, and you can therefore see that the company is out of the danger of being thrown into bankruptcy."

Frank Cota, President of the Norcor Company, testified to the effect that such company was merely a step in the plan to reorganize the old company and, that Lehner was acting as attorney for Krueger and, that the stock certificates delivered to him by Krueger were endorsed and turned over to Lehner. By various pleadings filed in the State Court receivership, it was plainly represented by Lehner, as well as Krueger, that the assignment of the claims and the incorporation of the Norcor Company was for the purpose, and a step taken in the reorganization and rehabilitation of the Norcor Manufacturing Company.

In October, 1935, a proceeding was instituted in the Federal Court against the debtor corporation for reorganization pursuant to Section 77B. As late as February 22, 1937, Krueger, in a letter, referred to Lehner as his attorney and the efforts being made in the reorganization proceeding.

Appellant, as stated, concedes the validity of the Norcor Company claim in the amount of $13,331.13, the amount actually paid for the claims assigned to it. Thus, the question presented is whether the Norcor Company is entitled to maintain a claim based upon the total face amount of the claims assigned to it, or merely upon the total consideration actually paid for such claims.

■ It is argued that Krueger and his attorney Lehner sustained such a fiduciary relation with the debtor corporation as would preclude them from purchasing claims of creditors at a small fraction of their face value, and using them as the foundation for a claim in excess of that actually paid therefor. We think this argument is sound. Certainly Krueger, as Managing Director, occupied such position.

■ In the recent case of Pepper v. Litton, 60 S.Ct. 238, 84 L.Ed. ——, decided December 4, 1939, is found a pertinent discussion of the duties and obligations of corporate officers. On page 245 of 60 S. Ct., 84 L.Ed. ——, it is stated: "* * * A director is a fiduciary. * * * So

is a dominant or controlling stockholder or group of stockholders. * * * Their powers are powers in trust. * * *"

■ On the following page, it is stated: "* * * In the exercise of its equitable jurisdiction the bankruptcy court has the power to sift the circumstances surrounding any claim to see that injustice or unfairness is not done in administration of the bankrupt estate. And its duty so to do is especially clear when the claim seeking allowance accrues to the benefit of an officer, director, or stockholder. * * *"

■ As Krueger occupied a fiduciary relation, so did his attorney Lehner. Neither of them would have been entitled to the allowance of a claim in an amount which would have inured to his individual profit. Being thus precluded as individuals, they had no right to accomplish the same purpose under the guise of a corporate entity. This is especially true in view of the fact that the only claimed purpose of the Norcor Company was to assist in the reorganization of the Norcor Manufacturing Company. As a matter of fact, it was a one-man corporation, owned, controlled and dominated by Lehner. The charge that Lehner's purpose in this respect was fraudulent, finds ample support.

■ Again, in Pepper v. Litton, supra, 60 S.Ct. page 247, 84 L.Ed. ——, the rule is aptly stated: "* * * He who is in such a fiduciary position cannot serve himself first and his cestuis second. He cannot manipulate the affairs of his corporation to their detriment and in disregard of the standards of common decency and honesty. He cannot by the intervention of a corporate entity violate the ancient precept against serving two masters. * *"

■ The court erred in overruling the exceptions to the Master's report in respect to this claim. It should be allowed in an amount not exceeding $13,331.13.

The Carlstein claim is predicated upon services rendered as a salesman for the Norcor Manufacturing Company. During the years 1931 and 1932, he was employed under a written contract to sell the products of said company and was assigned an exclusive sales territory, mostly in the New England states. By the terms of the contract, it was, under certain conditions, to be renewed for the year 1933.

Claim was filed in his name in the amount of $22,685.22; recommended for

allowance by the Master in the amount of $6,927.14; exceptions thereto, by appellant Schmitt, were overruled by the court and the claim allowed as recommended. Appellee urges here that the claim should have been allowed in the amount claimed. No cross appeal was taken from the order of the court, however, and the only question before us is the action of the court in allowing the claim as recommended by the Master.

Appellant argues that the claim should have been denied in toto on the theory that Carlstein was a party to the fraud charged against Krueger and Lehner. Also, that there is insufficient evidence to justify the Master's conclusion that the services were rendered. We do not deem it necessary to relate the testimony concerning the latter contention. We have read it and conclude that it justifies the finding that services were rendered and, that the amount allowed was a reasonable compensation therefor. The fraud charge presents a more serious question.

In 1933, Carlstein, at the request of Lehner, assigned his claim to the latter's wife for the sum of $750, which was paid him in cash. There is evidence to the effect that the assignment was conditioned upon a promise made by Krueger and Lehner that Carlstein was to have employment with the reorganized corporation and some of its stock. In February, 1937, shortly before the time fixed for filing claims in the reorganization proceedings in the Federal Court, Lehner returned said assignment to Carlstein, and the claim, as stated, was filed in the name of the latter. There is some evidence that indicates Carlstein occupied a rather close relationship with Krueger and Lehner, and while there is some suspicion in connection with this transaction, yet we do not believe the evidence justifies the conclusion that Carlstein was a party to the fraud. In this connection, it is of importance to note that during the years in question, Carlstein spent most of his time in the East, with an office in New York City far removed from the scene of activities as carried on by Lehner. Most of their dealings were by correspondence, and it is not unreasonable to conclude that Carlstein acted in good faith in the matter. It also must be remembered that this claim is in a situation entirely different from the claim of the Norcor Company. There, as we have held, the parties who occupied a fiduciary relation were seeking the allowance of a claim for their own profit and benefit. That can not be said as to Carlstein. Neither do we think that he occupied a fiduciary relation, but even if he had, he only sought what was owing him for services rendered. He did not purchase his claim and then seek to maintain it against the debtor at a sum greater than he had paid for it, as did Lehner and the Norcor Company. The $750 which Carlstein was paid for the claim was retained by him upon the cancellation of the assignment, with an agreement between him and Lehner that this amount was to constitute a lien upon the claim when allowed. The Master, in his report, makes no mention of this amount, and it is apparent, did not consider it. We think it should be deducted from the claim as allowed—in other words, the claim should have been allowed in the amount of $6,177.14.

The order of the District Court is reversed with directions to allow the claims in conformity with the views herein expressed.