**CUMBERLAND CORPORATION v. McLEL-LAN STORES CO. et al.**
**E79–195.**

District Court, S. D. New York.
April 27, 1940.

Krause, Hirsch & Levin, of New York City, for plaintiff.

Sullivan & Cromwell, of New York City, for defendants McLellan Stores Co., United Stores Corporation, George K. Morrow, and William W. McLellan.

Kaye, Scholer, Fierman & Hays, of New York City (Harold L. Fierman, of New York City, of counsel), for defendants Stuart Hedden and Hedden & Co., Inc.

Winthrop, Stimson, Putnam & Roberts, of New York City (Walter J. Holzka, of New York City, of counsel), for defendants Richard Maynard and Lawrence Oakley.

BYERS, District Judge.

This is a minority stockholders action, i. e., a derivative suit, concerning McLellan Stores Company, in which, as of November 26, 1934, the plaintiff seeks:

1. To enjoin the defendants from accepting an offer by defendants Stuart Hedden, and Hedden & Co., Inc., respecting the sale to McLellan Stores Company of landlords' claims, and from making payment therefor.

2. That such claims be impressed with a trust in favor of McLellan Stores Company.

3. Counsel fees and necessary disbursements in this action.

A motion for a temporary injunction was denied in November, 1934, and the cause came to trial on March 6, 1940. The reason for this delay has not been made to appear.

The bankruptcy of · McLellan Stores Company (hereinafter called McLellan) occurred in January of 1933, and the bankrupt estate was managed by Irving Trust Company, as trustee, for the ensuing two years. Through reduction in rentals as to most of its 260 or more stores, and capable administration, merchandise creditors ultimately received one hundred per cent. of their claims, and the company emerged from bankruptcy early in 1935, and has since continued the uninterrupted conduct of its affairs.

That result was foreseen as early as June of 1934, and the specific cause of the plaintiff's grievance is a transfer by the defendant Hedden, or his corporation, to McLellan of some 62 contingent claims of landlords under long term leases, for the sum of $225,000 in cash, and 35,000 shares of non-par common stock of the company, which had a market value in November, 1934, of around $420,000, making in all about $645,000 as the consideration for the transfer.

The transaction in contemplation when the bill of complaint was filed, was authorized at a regularly constituted meeting of directors of McLellan, held November 8, 1934 (the board retained and exercised customary functions during the bankruptcy) and that action of the directors was carried into effect at a stockholders' meeting held on November 28, 1934, by a vote of 381,910 in favor and 127,345 opposed, since the effort to prevent the holding of that meeting fell with the denial of the application for the temporary injunction.

That the landlords' contingent claims constituted a potential obstacle to the rehabilitation of McLellan was recognized from the time that efforts to that end began to occupy the attention of stockholders' and creditors' committees; the problem soon challenged the attention of certain exterior agencies whose purpose was to conduct salvage operations in the hope of gain.

The instrumentality of rehabilitation, as originally conceived, was a new corporation which was to purchase the bankruptcy estate as a whole, and start a separate enterprise with new working capital to be procured through conventional promotion. Two such efforts were made: First, Chain Stores, Inc., was organized and more or less definite proposals were made to establish it through procuring underwriters for its stock, but that plan never came to fruition. Second, Mac Stores Corporation was formed, and it too was never conducted to maturity as the pur-

chaser of McLellan assets and successor to its activities.

There were substantial efforts expended in the endeavor to perfect these successive corporate potentialities, and it would not be profitable to trace them in any detail, since neither performed any actual function in the return of the McLellan enterprise to its stockholders; perhaps the latter served a negative purpose, in that the rejection of its offer set the stage for the ultimate emergence of McLellan from bankruptcy.

It is not proposed to rehearse the tedious history of the events leading up to the latter rejection, which was seen to be inevitable in June of 1934. Referee Coffin, in charge of the case, found the opposition too sturdy and meritorious to give the proposal his sanction, and during the summer months of that year it became apparent that McLellan could be returned to its stockholders with all proven claims paid in full.

Then it was that United Stores Corporation, which was one of the exterior agencies to which reference has been made, began to acquire large holdings of McLellan stock in the open market, by a process that was entirely free from ostentation.

By the time the stockholders' meeting of November 28, 1934, was held, the United Stores Corporation owned or controlled some 225,600 shares of common and 700 shares of preferred stock, all of which were voted in favor of acquisition of the landlords' contingent claims for the price which has been stated.

The plaintiff's cause is based upon the theory that the purchase was consummated by the total stock vote earlier referred to, because information was suppressed of a secret understanding between United Stores Corporation and Hedden, the seller, that the latter's profit from acquiring and turning over the landlords' contingent claims (the 35,000 shares of common stock) was to be used in part by him for the benefit of United Stores in the liquidation of a portion of its own indebtedness to Sullivan and Cromwell, who had acted as attorneys from the early days of the bankruptcy, always for United Stores and sometimes for Hedden; and similarly with respect to Sanderson and Porter, engineers and financial advisers, who had also acted for United Stores as well as Hedden.

It is also urged that United Stores had acquired certain so-called confidential information respecting the various leases and the lessors' properties and intentions, with the consent of the trustee in bankruptcy, under circumstances which forbade that company itself to acquire the landlords' contingent claims; and since Hedden later was acting as the undisclosed agent for United Stores, or if not, the latter was his undisclosed principal, the circumstances which constrained United Stores to forego acquisition of those claims necessarily visited the same proscription upon Hedden; these things being so as seen by the plaintiff, it urges that Hedden must be regarded as a constructive trustee for McLellan, and the proceeds of the sale turned back to the latter as beneficiary.

That the plaintiff's undertaking was of ample dimensions is suggested by the foregoing recital.

The cause was tried continuously from March 6, 1940, through March 22d, and as the briefs have not been accompanied by the minutes, this decision is compiled from the court's own notes.

The defendants may be grouped as follows:

(1) McLellan Stores Company (William W. McLellan) the former bankrupt.

(2) Stuart Hedden, Hedden & Co., Inc., the transferor of the landlords' contingent claims.

(3) United Stores Corporation, and George K. Morrow, the largest individual stockholder of the former bankrupt and said to be implicated with Hedden.

(4) Lawrence Oakley and Richard Maynard, individual directors of the former bankrupt.

Apparently the individual defendants Powdrell and May were not served, and in any case they have not appeared by counsel.

The presently material averments of the complaint may be summarized as follows:

A. That the claims of the landlords not provable in the bankruptcy proceedings, and which therefore might be asserted against McLellan (the corporation), were discussed by various committees and interests concerned with the rehabilitation of the bankrupt company "and the fact that many of them were asserted for excessive amounts were (sic) disclosed in confidence, and upon the understanding that the information was to be used solely for the

benefit of the defendant corporation and its stockholders and to further a plan of rehabilitation for" their benefit; that the defendants agreed "that none of them were to deal with the landlords or attempt to acquire their claims except for the benefit of the defendant corporation and its stockholders; furthermore, that none of them would undertake to negotiate with said landlords or attempt to acquire their claims without first giving notice to the other parties".

B. That on January 8, 1934, Hedden notified the trustee and the various committees of creditors and stockholders of an intention to acquire the landlords' claims "in trust for the benefit of the defendant corporation and its stockholders"; and that all who were so notified relied upon the foregoing "and accordingly did not oppose or interfere with the consummation" of that acquisition; and that Hedden "purporting to act for the defendant corporation" proceeded without hindrance to acquire and adjust the landlords' claims, and was assisted by the defendant, William W. McLellan, "and their efforts were further facilitated by information and data in the possession of the defendant corporation and its trustee in bankruptcy"; by reason whereof the claims were acquired for less than their face amount; that the defendants Morrow and United Stores Corporation, with knowledge, assisted in that process, which was completed as to 62 claims of landlords for a total consideration of not to exceed $125,000.

C. That after the defendants Hedden, United Stores Corporation and George K. Morrow, had acquired these landlords' claims, and interests therein, they repudiated their agreement to hold the same as trustees for the defendant corporation and its stockholders. And they thereupon "conspired and unlawfully planned and agreed to sell said landlords' claims to the corporation and exact a profit therefor to accrue to them personally".

D. That as of November 2, 1934, Hedden on his own behalf and that of the United Stores Corporation and Morrow, and pursuant to the said plan and conspiracy, and in violation of their "duty to defendant corporation and its stockholders, offered to sell said landlords' claims to the defendant corporation for the sum of $225,000, plus the issuance to them of 35,000 shares of the common stock of the defendant corporation"; the total consideration amounting to a sum in excess of $660,000, which is unconscionable and in fraud of the corporation and its stockholders; and that the terms of the offer do not adequately protect the corporation.

E. That the offer was approved at a meeting of the directors of the said corporation on November 8, 1934, by a vote of five to three, which action was improvident, fraudulent and in violation of the rights of the corporation; that the special meeting of stockholders called pursuant to the said action of the board was pursuant to a notice which "fails to disclose to the stockholders the circumstances" above summarized, or that the price is more than five times what was paid for the landlords' claims.

F. That the United Stores Corporation and George K. Morrow and their nominees own and hold a majority of the capital stock of the defendant corporation, which they intend to vote in favor of accepting the said offer in violation of the corporate rights, and that the consummation of the purchase will constitute an irreparable injury to the plaintiff and other stockholders, and a waste of the corporate assets.

As has been stated, an injunction was demanded and that it be decreed that the landlords' claims in question be impressed with a trust in favor of the corporation, and that the United Stores Corporation and Morrow and Hedden be directed to assign the landlords' claims to the corporation.

In many material respects, the evidence repudiates the allegations in the complaint, and it will be convenient to now state the contentions of the plaintiff as summarized in its argument, at the close of the case, concerning the reasons why the plaintiff was conceived to be entitled to a decree. They are as follows:

First: That Stuart Hedden was shown to have been a trustee under a constructive trust for McLellan.

Second: That he acquired confidential information respecting landlords' claims from the trustee in bankruptcy and, when he set out to procure those claims for his own account, he rested under an equitable obligation not to turn them into personal profit.

Third: That the evidence fairly revealed a community of interest between Hedden and United Stores Corporation,

844

arising from Hedden's activities beginning in the summer of 1933 and terminating at the. time of the stockholders' meeting; and that there was a failure to disclose that interest at the time of the directors' meeting of November 8, 1934, and similarly at the stockholders' meeting of November 28, 1934, from which it is to be inferred that the vote approving the acquisition of the landlords' claims from Hedden was not adopted with knowledge thereof on the part of the other stockholders.

■ The difficulty with the first theory is that the inception of the fiduciary relationship as asserted between Hedden and McLellan has not been exposed to view.

In the spring of 1933, Hedden, who was then a member of the firm of Fuller, Rodney & Company, a Wall Street house, was told by one Charles Nichols of the condition of the affairs of McLellan, and of the possibility that its reorganization might be contrived on a profit-yielding basis; they agreed that, if an underwriting of stock in a new corporation were to be successfully consummated, Nichols was to get a so-called "finder's fee" (ultimately he was paid $12,000).

Hedden immediately examined into the situation and interviewed numerous individuals having available capital, who might participate in the underwriting; soon it developed that his firm did not wish to act as an underwriter in this matter, and Hedden withdrew, and formed the firm of Hedden, Farwell & Company in the fall of 1933; later that firm was succeeded by Stuart Hedden & Company, and still later by Hedden & Co., Inc.

Late in 1933, he was cooperating with G. & M. P. Murphy and Sanderson & Porter; because that was a cumbersome aggregation, Hedden ultimately acted alone in seeking to interest various banking houses and other sources of capital in successive plans to underwrite the issue of stock for an enterprise to take over the McLellan Stores.

It would seem too clear for extended discussion that his entire course of activity had for its objective the making of a profit as compensation for his activities, and that he was at no time associated or affiliated with McLellan as an officer, director, agent, or representative; nor was there a concealment from that corporation, or its directors or officers, of his purpose to translate his activities and efforts into money

which should go into his own pocket. There is no testimony to the effect that those members of the board of directors who opposed the acceptance of Hedden's offer to transfer the landlords' claims considered that he was obligated to deliver those claims to McLellan without profit to himself, and the only modification of this statement has to do with what could be termed, at most, a lawyer's misgiving in respect of a possible interpretation to be placed upon certain transactions during the summer and fall of 1933, and the early months of 1934.

If the testimony on that subject has been understood, it amounts to nothing more than the statement by a cautious lawyer that he was unwilling to say that there was nothing in this suggestion that Hedden may have acquired the landlords' claims in a fiduciary capacity; that statement was seized upon by one of the directors, Mr. Powdrell, who was not called as a witness, as a basis for his. own opposition to the acceptance of the Hedden offer.

Since the evidence fails entirely to disclose any direct, much less fiduciary, relationship between Hedden and McLellan, it became necessary for the plaintiff to urge a substitute theory which can best be understood if it is stated somewhat inversely:

The United Stores Corporation became the largest single stockholder of McLellan during the summer or early fall of 1934; in August of 1933 that corporation had acquired confidential information from the trustee in bankruptcy concerning the then status of contingent landlords' claims, which it was precluded from turning to its own advantage at any time; Hedden was a sort of undercover man working in the interests of United Stores Corporation, and whatever profits he made were in part for the benefit of the United Stores Corporation; therefore, to the extent that such profits benefited that company, they were tainted by a breach of confidence so imparted by the trustee; that this infidelity inured to the benefit of McLellan when it emerged from bankruptcy; and in consequence of the foregoing the stockholders' vote of November 28, 1934, must be disregarded, since United Stores concealed from the other stockholders its true interest in securing that vote.

■ It will be seen that at the basis of this theory lies the concept of the

right of the trustee in bankruptcy to impose the seal of secrecy upon those who had official dealings with it.

The plaintiff assumed that a competent discharge of the trustee's duties embraced the right to withhold from creditors at large, or possible purchasers of the bankrupt's property, full and complete information respecting the assets and liabilities of the bankrupt, including those which could not be discharged in the bankruptcy proceedings; and that, for some weighty reason which has not been disclosed, both the trustee and its attorney were warranted in withholding a full disclosure of all relevant facts, covering some of them with a mantle of secrecy which could be lifted only by the trustee.

I should suppose that the exact contrary would be the fact. The trustee was an agent of the court, charged with the performance of well defined duties under the Bankruptcy Act, and would have no more right to refuse to disclose the most complete information with respect to all of the assets and liabilities of the bankrupt, than would the court itself; and that, even though there were an attempt to impose an obligation of non-disclosure, such effort could not possibly give rise to a constructive trust, founded upon a failure to perform that undertaking of suppression, which a court of equity could be called upon to enforce.

The foregoing is written, not because the court has been persuaded that any such fiduciary relationship was sought to be created by the trustee, but to indicate that a discussion of the evidence to disprove its existence would scarcely be justified.

 It is true that the status of the contingent landlords' claims during the period between the month of August, 1933, and the 10th day of February, 1934, was thought to be somewhat doubtful, because the decision of the Supreme Court in Manhattan Properties, Inc., v. Irving Trust Co., 291 U.S. 320, 54 S.Ct. 385, 78 L.Ed. 824, was not rendered until the latter date.

There was a so-called gentlemen's agreement effective from August to December of 1933, that no one would seek to obtain landlords' claims by direct negotiation, without the prior written consent of the trustee. This was followed by the so-called "stand-still agreement", forbidding such negotiations except upon a twelve-

hours' notice to the trustee, of departure therefrom; such a notice was given by Hedden at 10 a. m. on January 8, 1934, to the trustee, and pursuant thereto he took the necessary steps to acquire the claims recited in the complaint.

The plaintiff urges that the only party to that agreement who had obtained confidential information from the trustee's files was the United Stores Corporation, under circumstances which need not be described at length; and that it was never released therefrom by the trustee, although the effort was made to induce the latter to see, as of January 8, 1934, that the obligation, if any, should be deemed terminated on that date.

From what has been said, it must be clear that the court does not incline to the view that anything in the trustee's file was confidential in any sense of the word; the compilation of data respecting the contingent landlords' claims, which was undertaken by Sullivan & Cromwell as the attorneys for United Stores Corporation in cooperation with a representative of Sanderson & Porter, was a costly thing and, at the time that it was undertaken, a letter was written (Plaintiff's Exhibit 44) upon which great stress is laid by the plaintiff as indicating the clandestine nature of the information thus made available.

That letter merely refers to tabulating the information and says that both of the gentlemen engaged "will be considered to be representatives of the trustee, but their compensation and expenses in connection with the preparation of this data will be paid by our clients * * *". The report was to be to the trustee in the first instance, who in turn was to furnish certain copies at the expense of United Stores Corporation, including one to the preferred stockholders' protective committee; the report was not to be distributed or exhibited to any other person "except upon payment by such person to our clients of one-half of the costs, not theretofore so repaid to our clients, incurred by them in connection with the investigation and preparation of such report".

The foregoing is now construed to mean that the trustee was relieved of certain clerical and legal work in connection with the compilation of the data referred to; and that if anyone else wished to have a copy of the report, he would have to pay a portion of the cost involved in its preparation; obviously anybody could

get it by making that payment and, if that is so, its true nature must have been commercial rather than confidential.

The final paragraph of the letter reads: "Our clients will not, nor will anyone associated with them, directly or indirectly negotiate with any present or former landlord of the bankrupt company with respect to any matter unless the prior consent in writing of the trustee has been first had and obtained."

That paragraph is merely a statement of a self-imposed restriction which was recognized and observed by United Stores and all other parties who were in consultation with the trustee during the period to which reference has been made.

It seems clear that, once Hedden's letter of January 8th was written to the trustee, announcing his intention to negotiate with the landlords at the end of a twelve-hour period, the "stand-still agreement" was no longer binding upon any of the participants, and the fact that Sullivan & Cromwell on that day wrote a letter to the trustee's attorneys, stating that they so regarded the developments which have been recited, should not be construed as an application for release which was refused—because there is no evidence that the trustee's attorneys replied to their letter—but rather as a candid statement of the then status of affairs between United Stores Corporation and Hedden.

That letter (Exhibit 49) concludes as follows:

"It is our belief that, in view of all the circumstances, the agreement contained in our letter of August 21, 1933 (Exhibit 44) should now be considered as having been superseded by the general agreement on the part of all parties for the giving of twelve hours notice (the stand-still), and that, even though the agreement were not superseded, it should not be interpreted so as to prevent our client from committing itself to Mr. Hedden. The effect of such interpretation would be, we believe, to penalize our client unjustly and would be contrary to the spirit and intent of our letter of August 21st. We trust that you concur with us in these views."

The failure of the trustee to reply to that letter is certainly compatible with concurrence in the views expressed. The letter is too long to quote otherwise, but it makes clear that Hedden was proposing to form a new company to acquire the bankrupt estate, and that he was anxious to have United Stores Corporation agree to buy stock in that company.

It is manifest that a necessary element of the plan was the acquisition of the contingent landlords' claims in connection with the new company.

Enough has probably been written to demonstrate that there was no constructive trust created in favor of the trustee in bankruptcy as against the United Stores Corporation, and that consequently no such trust devolved upon McLellan when the bankruptcy came to an end, and therefore there was nothing of that nature to be visited upon the United Stores Corporation, or Hedden as its undisclosed agent, and the theory advanced by the plaintiff in that behalf is completely untenable.

■ It is next urged that Hedden constituted himself an express trustee for the benefit of McLellan and its security holders, with reference to Mac Stores, Inc., because he assured the preferred stockholders' committee that he would hold the landlords' claims as trustee for Mac Stores, Inc., and although the latter was never organized and therefore its stock was never underwritten and sold in connection with the McLellan bankruptcy, nevertheless, since that tentative relationship was so proposed, it must be deemed to have continued—although it never began—when McLellan did resume the conduct of its affairs. The statement of this position seems to carry its own refutation. As has been said, the offer of Mac Stores to buy the McLellan assets was never accepted and, so far as this record demonstrates, that corporation never functioned and no trust ever arose, on its behalf, which could have been visited upon Hedden.

■ In connection with this theory, it is necessary to examine the plaintiff's contention that the real vice of the acceptance by McLellan of the Hedden proposition for the purchase of the contingent landlords' claims, at the figures stated, lay in the fact that, out of the 35,000 shares of capital stock which constituted a portion of the purchase price, Hedden paid substantial fees to Sullivan & Cromwell and Sanderson & Porter, which really represented work done by them for United Stores Corporation.

The amounts involved were substantial but that does not affect their true character. The argument is made that Sullivan

& Cromwell and Sanderson & Porter were never in fact employed by Hedden, and that the payments to them made by him according to the testimony of all concerned, were really colorable assumptions of a portion of the financial burden necessarily assumed by United Stores Corporation toward those respective firms for their services rendered to it in connection with the McLellan affairs.

It is urged that such theory is fortified by certain language in Exhibit 70, a letter which was written by Hedden on March 5, 1934, to Sullivan & Cromwell; and by a proposed form of letter which seems never to have been sent but which was suggested under date of February 23, 1934, for signature by Hedden. It does not seem to me that this is of sufficient importance to require discussion. Members of both firms testified as witnesses at this trial, to the effect that they rendered services to Hedden pursuant to independent employment by him; in the absence of credible evidence to the contrary, there is no occasion for ignoring their testimony, for neither is a party to this suit.

These payments constitute the sole basis, so far as the plaintiff's evidence discloses, of anything that United Stores Corporation could possibly gain through the acceptance of Hedden's offer. What it had to lose, was the diminution in the book value of the common shares of the McLellan company which it then owned, through the issuance to Hedden of 35,000 shares of the then unissued common capital stock of the company. There has been no attempt to establish the mathematical relationship between the two aspects of the transaction.

It should be recalled that, when Hedden's negotiations with the directors of McLellan during the summer of 1934 began to receive the active attention of that board, the constituency of the latter was entirely independent of the United Stores Corporation. The problem, as the directors saw it, called for the exercise of business judgment, namely, the best possible terms which could be arrived at for the acquisition by the corporation of the landlords' contingent claims, to the end that when the bankruptcy proceedings should be terminated, the corporation could resume its business career, free from the hazard of the aggregate liability which they embraced.

The negotiations were protracted, and involved the services of two successive special committees of the board; the members of each understood that, in some more or less indefinite way, it had been suggested that Hedden might not be a free agent in the sale of those claims.

That subject seems to have been debated back and forth between the committees, Hedden, and various attorneys, including counsel to the preferred stockholders' protective committee; the preponderant opinion developed that no such trustee relationship as was suggested could be brought to light, although as is customary in legal circles, there was at least one lawyer who said that he was unwilling to commit himself completely on that proposition.

After months of study and negotiation, Hedden's original offer to accept his actual out-of-pocket expenses, namely, $225,000, plus 60,000 shares of the stock of the company, was reduced to the offer that was finally accepted, by which the latter figure was diminished to 35,000 shares, and by the vote which has been stated the directors agreed to accept that offer and recommend it to the stockholders.

The stockholders' vote resulted in the adoption of the recommendation by the vote which has been stated, namely, 381,910 in favor, and 127,345 against. If there be subtracted from the affirmative vote the entire holdings of the United Stores Corporation, of 225,600 shares, it will be seen that the vote in favor is reduced to 156,310, and the vote opposed remains at 127,345.

It should be stated that the offer contemplated a verification by Sanderson & Porter of the cost figures as stated by Hedden, namely, $225,000, and that is criticised by the plaintiff for the reason that one of the members of Sanderson & Porter was a director of McLellan; and since that auditing firm had been in the employ of Hedden from late in December, 1933, until the end of the summer of 1934, the audit of his figures by Sanderson & Porter should be viewed with misgivings—to say nothing more.

There is no evidence to sustain a contention, if one is pressed, that the verification of Hedden's costs was false.

If the directors and stockholders were content to rely upon that audit, they had the right to do so, and nothing in the evidence proves that their confidence was misplaced.

█ It may be said in general that the plaintiff thinks that too much money was paid to Hedden, and that the amount of his

profit was unreasonable because it really included compensation to him for unsuccessful efforts that he had made, during the entire period of his activity, to earn money through various underwriting plans which fell by the wayside; and that there is something inherently unfair in permitting him to reap, in the guise of profit on the transfer of the landlords' contingent claims, that which he failed to earn by way of underwriting gains.

The answer is, that whether his profit was unduly large is not the issue before the court. The question is.: Did the United Stores Corporation conceal from the other stockholders a secret participation by it in Hedden's profits? The negative answer to be given to that question admits of no doubt whatever. There is no showing that the United Stores Corporation did participate in Hedden's profits, and consequently there was nothing for it to conceal.

The plaintiff relies upon In re McCrory Stores Corporation, D.C., 12 F.Supp. 267, 269. Probably this is cited because it involves the United Stores Corporation and its relationship to McCrory Stores Corporation and a reorganization of the latter under the then Section 77B of the Bankruptcy Act, 11 U.S.C.A. § 207.

In that case there were landlords' claims of the same nature as those here considered. The United Stores Corporation was the assignee of those claims and, as such, a creditor to whom securities were to be issued as part of the reorganization. Hedden had acted as its agent in the acquisition of certain of those claims, and thereafter he became a director of the debtor company, as the representative of the United Stores Corporation, which was also a large holder of preferred stock. During his directorship he ceased activity in conducting negotiations with the landlords, but the opinion of the court says on this subject: "* * * there can be no doubt that his service as a director was incidental to the task of getting landlords' claims for the United. He served as director for scarcely a month, but in that time information came to him as to what had theretofore been achieved in the way of settling landlords' claims by a Chicago group working under the debtor's directions. Those settlements were contingent on reorganization and did not involve the payment of money to the landlords. Immediately on his resignation as director he resumed active work for the United and purchased for cash practically all of the landlords' claims."

The opinion continues to the effect that Hedden and the United were in competition with the debtor, which was still making efforts to settle the landlords' claims, and that condition disqualified · Hedden, as a director, from acquiring claims upon which he could make a profit—the debtor being insolvent—and that this disqualification survived his resignation as a director; and that the United suffered under the same disability, namely, it could enforce the landlords' claims for no more than was actually paid, together with a reasonable allowance for expenses involved in their acquisition.

The plan before the court was disapproved in part because it discriminated unfairly in favor of the United Stores Corporation.

One reason for the tedious length of this opinion is to indicate the difference between the facts here involved and those presented to the court in the McCrory case.

The plaintiff also cites Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. ——, and In re Norcor Manufacturing Co., 7 Cir., 109 F.2d 407. Neither involves facts which are capable of assimilation into the issues here involved.

The most that can be said for the plaintiff's cause is that, in spite of its failure to demonstrate its cause of action as pleaded, it has brought to light evidence that there was a difference of opinion on the part of the McLellan directors concerning the wisdom of dealing with Hedden at all as an assignor of the landlords' claims; and also with regard to the amount that should be paid to him if the doubt should be resolved in his favor, and that the directors exercised poor judgment in reaching the conclusion that they did. That is not a sufficient basis to sustain the plaintiff's bill, particularly in view of the action of the stockholders, there being no evidence of fraud on the part of the largest stockholder in voting to accept Hedden's offer. Helpful cases on this subject are: Continental Insurance Co. v. New York & H. R. Co., 187 N.Y. 225, 79 N.E. 1026, and Gamble v. Queens County Water Co., 123 N.Y. 91, 25 N.E. 201, 9 L.R.A. 527.

It results from all of the foregoing that the defendants are entitled to a decree

dismissing the bill on the merits, with one bill of costs. If findings are desired, they may be presented for settlement in connection with the decree.