## MANUFACTURERS TRUST CO., TRUSTEE, *v.* BECKER ET AL.

No. 55.  Argued October 20, 1949.—Decided November 21, 1949.

*Edward K. Hanlon* argued the cause and filed a brief for petitioner.

*David W. Kahn* argued the cause and filed a brief for respondents.

*Solicitor General Perlman, Roger S. Foster, David Ferber* and *W. Victor Rodin* filed a brief for the Securities & Exchange Commission, as *amicus curiae,* urging reversal.

MR. JUSTICE CLARK delivered the opinion of the Court.

This proceeding in bankruptcy is on objections to the allowance of claims equal to the principal amount of bonds of the debtor acquired at a discount during its insolvency by close relatives and an office associate of directors of debtor. Petitioner's objection that equitable considerations require limitation of the claims was dismissed by the referee, and the District Court affirmed. 80 F. Supp. 822. Following affirmance by a divided Court of Appeals for the Second Circuit, 173 F. 2d 944, we granted certiorari because the issue presented has importance in the administration of the arrangement and corporate reorganization provisions of the Bankruptcy Act. 337 U. S. 923.

On January 8, 1946, Calton Crescent, Inc., sold its only property, an apartment house located in New Rochelle, New York, for $300,000 pursuant to a contract entered into in October 1945. Being unable to discharge in full its obligations under debenture bonds maturing in 1953, outstanding in principal amount of $254,450, debtor filed in May 1946, a petition under Ch. XI of the Bankruptcy Act, 11 U. S. C. § 701 *et seq.* Under the plan of arrangement, authorizing a dividend of 43.61% of the principal

amount of the bonds, respondents Regine Becker, Emily K. Becker, and Walter A. Fribourg were to receive an aggregate dividend of $64,237.53 on allowance of claims based on respective individual holdings of debentures which total $147,300 in principal sum but were acquired at a total cost of $10,195.43.[1] Petitioner, Manufacturers Trust Company, appearing individually as creditor for fees and disbursements due it as indenture trustee and also as original trustee under said indenture, objected to allowance of respondents' claims as filed, on the ground that the circumstances of respondents' acquisitions require limitation of their claims to the cost of the debentures plus interest.

The circumstances pertinent to our consideration of petitioner's objections are as follows: The debtor was organized in 1933 to take title to the apartment property pursuant to a plan of reorganization. By January 1942 debtor had defaulted under the terms of the first mortgage and was operating with a deficit; at no time in the previous several years had its debentures been selling on the market at more than 8% of face value.

While debtor was then considering a sale of the property for $220,000, a suit to enjoin the sale was brought by Sanford Becker, son of respondent Regine Becker and husband of respondent Emily Becker.[2] Thereafter he proposed to arrange a loan on second mortgage to debtor of $15,000 to pay off the arrearages on the first mortgage,

---

[1] The amount and cost of the respective holdings of the respondents, insofar as objected to, are as follows:

|  | Principal Amount | Cost |
|---|---|---|
| Regine Becker | $44,500 | $3060.63 |
| Emily K. Becker | 52,800 | 5010.00 |
| Walter A. Fribourg | 50,000 | 2124.80 |

[2] Sanford Becker and respondent Fribourg first became interested in the affairs of debtor in September 1941. Soon thereafter each

all share and debenture holders being invited to partici-
pate. In April 1942 debtor accepted the offer, but none
of its share or debenture holders elected to participate
other than respondent Fribourg, who had desk room in
the offices of Sanford Becker and his brother Norman
Becker and was a long-time friend of the former. The
loan was made by respondents Regine Becker, Emily
Becker, and Fribourg. The second mortgage thus created
was in default by the end of 1942, and in 1943 respond-
ents took an assignment of rents but did not foreclose;
nor was there change in management of the property.
The second mortgage and interest were paid upon sale
of the property in 1946. In addition to the second mort-
gage, sums aggregating $7,921.63 were advanced by re-
spondents to pay taxes; this amount was repaid without
interest in 1944 and 1945. Pursuant to provisions of the
loan agreement in 1942, Sanford and Norman Becker were
made directors of debtor, and when the remaining three
directors resigned in 1944, the vacancies were filled by
nominees of the Becker brothers.

The referee found that from early 1942 the market
value of the property of debtor was insufficient to pay its
debts. However, the record shows a tax valuation during
the period of only slightly less than the outstanding in-
debtedness.[3] And although the debtor's operating ac-
count frequently ran in arrears, it revealed a surplus in

purchased, independently, debentures of debtor of the face value of
$5,000. No contest is made of these purchases.

It appears that transactions in the debentures included the transfer
of capital shares of the debtor which had no market apart from the
debentures.

[3] The major items of indebtedness consisted of (1) the first mort-
gage on the apartment building in original principal amount of
$175,000, which had been reduced by 1946 to $154,000, of which
reduction $7,875 had been paid since 1943; (2) the second mortgage

1945. Prior to disposing of its property debtor was at all times a going concern.[4]

The debentures on which respondents claim were acquired, at prices varying from 3% to 14% of face value, after the Becker brothers became directors in 1942.[5] Sanford Becker did not buy additional debentures after becoming a director. Norman Becker never owned any interest whatever in the debtor. Although neither of the Becker directors was interested in any purchase of the respondents, the debentures of Regine and Emily Becker were purchased through the agency of the Becker brothers and in the latter's judgment. The debentures of Regine Becker were purchased from an over-the-counter securities broker. Those of Emily Becker were acquired in part from the same dealer, in part from an estate whose attorneys were fully informed as to debtor's financial affairs, and in part from a Christian Association represented by a member of its investment committee who was fully advised as to the condition of debtor.

Some of Fribourg's debentures were bought from dealers in the over-the-counter market; others were acquired through an agent from the president and vice president of debtor when they withdrew from its management in 1944, and from other holders after the retiring president insisted that the offer made to him by Fribourg's agent be extended to all holders and be accompanied by

and tax advances of the respondents totalling some $22,000, and (3) the debentures of $254,450, on which, however, interest was payable only if earned. The tax valuation was $421,630.

[4] The District Court's characterization of debtor as a going concern was not upset by the Court of Appeals and is accepted here.

[5] Regine Becker began purchases on February 10, 1944, and continued through August 30, 1945. The purchases of Emily Becker were made between May 24, 1944, and February 5, 1945. In addition to the purchases referred to in note 2, *supra*, Fribourg made purchases through June 4, 1946.

a statement of the president's intention to accept. Fribourg was in the market for speculative securities and purchased the debentures as a "gamble," being influenced by the tax valuation of the apartment building.

All of respondents' debentures, with the exception of $2,000 in face value purchased by Fribourg from a dealer, were acquired in advance of the contract for sale of the apartment property and the filing of debtor's petition for arrangement.[6]

It was the referee's finding, left undisturbed by both courts below, that respondents' purchases were without overreaching or failure to disclose any material fact to the selling bondholders. Petitioner does not here contend that respondents' claims should be limited because of conduct by the Becker directors or by respondents amounting to bad faith or abuse of fiduciary advantage. Nor does petitioner contend that respondents' bondholdings influenced the conduct of corporate affairs to the injury of the corporation or other creditors. Indeed, the referee found that the purchases were not unfair to debtor, that at the time of respondents' purchases debtor was not in the field to settle its indebtedness on the debentures, and that the assistance rendered to debtor by respondents materially aided in its grave financial situation. Moreover, the findings indicate that the most generous suggestion of an offer for the apartment building after the Beckers became directors and prior to the sale was at a figure substantially less than the sale price.

Petitioner urges broadly that directors are precluded from profiting by the purchase of claims against an in-

---

[6] The latest purchase by a respondent clearly prior to the contract for sale was by Regine Becker on August 30 preceding the contract in October 1945. Fribourg apparently acquired $1,500 of debentures after the contract of sale and an additional $500 after the filing of debtor's petition.

solvent corporation. And, it contends, if directors may claim only the cost of debt securities acquired at a discount during a debtor's insolvency, those related as respondents are to the Becker directors should not be permitted to do more. Thus we view respondents' claims initially as if they were claims of directors.

This Court has repeatedly insisted on good faith and fair dealing on the part of corporate fiduciaries. It is especially clear, when claims in bankruptcy accrue to the benefit of a corporate officer or director, that the court must reject any claim that would not be fair and equitable to other creditors. *Pepper* v. *Litton,* 308 U. S. 295, 308–309 (1939).[7]

Claims of a corporate officer or director arising out of transactions with the corporation have been enforced when good faith and fairness were found. *Sanford Fork & Tool Co.* v. *Howe, Brown & Co.,* 157 U. S. 312 (1895); cf. *Manufacturing Co.* v. *Bradley,* 105 U. S. 175 (1882); see *Richardson's Ex'r* v. *Green,* 133 U. S. 30, 43 (1890); *Twin-Lick Oil Co.* v. *Marbury,* 91 U. S. 587, 589–591 (1876). Likewise a standard of good faith and fair dealing has been found applicable, where not superseded by a differing legislative or administrative rule, to purchases by directors of corporate shares, in the over-the-counter market, at less than book value on conversion under a plan of public utility reorganization. *Securities and Exchange Commission* v. *Chenery Corporation,* 318 U. S. 80 (1943); cf. *id.,* 332 U. S. 194 (1947). In the first *Chen-*

---

[7] Since the power of disallowance of claims, conferred on the bankruptcy court by § 2 of the Act, 30 Stat. 545, 11 U. S. C. § 11, embraces the rejection of claims "in whole or in part, according to the equities of the case," *Pepper* v. *Litton,* 308 U. S. 295, 304–305 (1939), the court may undoubtedly require limitation of the amount of claims in view of equitable considerations. Cf. Bankruptcy Act, § 212, 52 Stat. 895, 11 U. S. C. § 612.

*ery* decision it was declared that equity has not imposed "upon officers and directors of a corporation any fiduciary duty to its stockholders which precludes them, merely because they are officers and directors, from buying and selling the corporation's stock." 318 U. S. at 88.

When the transactions underlying respondents' claims here are drawn alongside a good faith standard of fiduciary obligation, they appear unobjectionable. There is no component of unfair dealing or bad faith.[8] The findings negative any misrepresentation or deception, any utilization of inside knowledge or strategic position, or any rivalry with the corporation.[9] During the period of the purchases the conduct of the Becker directors and of respondents with reference to the affairs of the debtor was to its substantial benefit and to the advantage of the other debenture holders. And there is nothing to suggest that had the debentures been acquired by the Becker directors, they would have been unjustly enriched. Cf. *Securities and Exchange Commission* v. *Chenery Corporation, supra,* 318 U. S. at 86.

However, it is the contention of petitioner, and of the Securities and Exchange Commission as *amicus curiae,* that a standard of good faith and fair dealing is inadequate here. Relying particularly upon *Magruder* v. *Drury,* 235 U. S. 106 (1914), they invoke the principle that a trustee can make no profit from his trust. But *Magruder* v. *Drury* involved an express trust, and even during insolvency corporate assets "are not in any true

---

[8] Cf. *In re The Van Sweringen Co.,* 119 F. 2d 231 (C. A. 6th Cir. 1941); *In re Norcor Mfg. Co.,* 109 F. 2d 407 (C. A. 7th Cir. 1940).

[9] Cf. *In re Jersey Materials Co.,* 50 F. Supp. 428 (D. N. J. 1943); *In re McCrory Stores Corp.,* 12 F. Supp. 267 (S. D. N. Y. 1935).

and complete sense trusts." *Hollins* v. *Brierfield Coal & Iron Co.,* 150 U. S. 371, 381–382 (1893).[10]

The Commission asserts, also, that if a director is free to acquire corporate obligations at a discount during insolvency and later enforce them in full, he will be subject to a possible conflict of interests inconsistent with his role as fiduciary to creditors of the corporation. Specifically it is argued that he may seek to postpone adjustment of claims or the institution of proceedings for relief, when such action would serve the interests of the corporation and its creditors, in order to continue his own purchase of corporate obligations at a market price lower than the valuation which he has made with the benefit of inside information.

This Court has recognized that equity must apply not only the doctrines of unjust enrichment when fiduciaries have yielded to the temptation of self-interest but also a standard of loyalty which will prevent a conflict of interests from arising. See *Weil* v. *Neary,* 278 U. S. 160, 173 (1929); cf. *Woods* v. *City Nat. Bank & Trust Co.,* 312 U. S. 262, 268 (1941). In this case the consideration is whether or to what extent a conflict of interests would arise from a director's opportunity to purchase unmatured obligations of a corporation which, though technically insolvent, remains nevertheless a going concern. That "there is no such conflict in the ordinary case of the purchase by a director in a going corporation of its outstanding obligations," *Seymour* v. *Spring Forest Cemetery Assn.,* 144 N. Y. 333, 344, 39 N. E. 365, 367 (1895),

---

[10] Other holdings upon which the Commission relies, *Pepper* v. *Litton, supra,* note 7, and *Woods* v. *City Nat. Bank & Trust Co.,* 312 U. S. 262 (1941), were considered in *Securities and Exchange Commission* v. *Chenery Corporation,* 318 U. S. 80, 89 (1943), and there distinguished on grounds which are also dispositive here.

would seem true not only of solvent corporations.[11]  Certainly the present record does not tend to establish that the opportunity for such purchases during insolvency would deprive a going corporation of the sound judgment of its officer.  And in any event the potentiality of conflict must be weighed against the desirability of permitting reinforcement of the insolvent's position insofar as a director's acquisition of claims may help.[12]  On this record the probability that an actual conflict of loyalties arose from the opportunity to purchase respondents' claims, while the debtor was a going concern, is not great enough to justify the exercise of equity jurisdiction which petitioner urges.[13]

Undoubtedly the possibilities of a conflict of interests for the purchasing director are intensified as the corporation becomes less a going concern and more a prospective subject of judicial relief.  And if it is clear that a fiduciary may ordinarily purchase debt claims in fair transactions

---

[11] Courts of equity, in defining the responsibility of officers of a corporation which is insolvent and yet a going concern, have frequently assigned greater importance to the corporation's vitality than to its insolvency.  *E. g., Sanford Fork & Tool Co.* v. *Howe, Brown & Co.,* 157 U. S. 312 (1895); *White, Potter & Paige Mfg. Co.* v. *Henry B. Pettes Importing Co.,* 30 F. 864 (E. D. Mo. 1887).

[12] As respondents' purchases of debentures resulted in their securing control of debtor, see note 2, *supra,* the acquisitions arguably were a factor in preventing further financial deterioration of debtor.  See also 62 Harv. L. Rev. 1391, 1392 (1949): Insolvency "is the very time when such purchases may be of most benefit to the corporation, since the credit of the corporation may be improved if it is known that directors are purchasing the corporation's securities; also it may be possible to forestall a bankruptcy petition while the corporation improves its financial position."

[13] Cf. *In the Matter of Wade Park Manor Corporation, Report of Special Master: Claims of Macklin et al.* (N. D. Ohio, 1949); see 3 Collier, Bankruptcy (14th ed.), p. 1784, 1948 Supp. p. 124.

during solvency of the corporation,[14] the lower federal courts seem equally agreed that he cannot purchase after judicial proceedings for the relief of a debtor are expected or have begun.[15] In this case, which lies between, it is unnecessary to determine precisely at what point the probability of conflict requires that equity declare ended the opportunity for profitable trading. It could hardly have been prior to the latest purchases of Regine and Emily Becker.[16]

The nature of the relation between Fribourg and the Becker directors makes immaterial that some of Fribourg's debentures may have been purchased after the corporation ceased to have the potency of a going concern, in expectation of or even after bankruptcy. Neither director had any indirect interest in Fribourg's holdings or served as his agent for purchase. Fribourg, moreover, had begun to acquire debentures some months before the negotiations leading to the election of the Beckers as directors of the debtor and, according to Fribourg's uncontradicted testimony, he began to purchase after looking over the apartment following Sanford Becker's mention of his own purchase. There is nothing in the record to indicate that Fribourg's purchases after the Beckers became directors were influenced by advice from them.

---

[14] See *In re Philadelphia & Western R. Co.*, 64 F. Supp. 738, 739 (E. D. Pa. 1946); *Ripperger* v. *Allyn*, 25 F. Supp. 554, 555 (S. D. N. Y. 1938); *In re McCrory Stores Corp.*, note 9, *supra*, at 269.

[15] *Monroe* v. *Scofield*, 135 F. 2d 725 (C. A. 10th Cir. 1943); *In re Norcor Mfg. Co.*, note 8, *supra; In re Philadelphia & Western R. Co.*, note 14, *supra; In re Jersey Materials Co.*, note 9, *supra; In re Los Angeles Lumber Products Co.*, 46 F. Supp. 77 (S. D. Cal. 1941).

[16] Thus it becomes unnecessary to determine whether the relation of the Becker respondents to the directors was such as to require limitation of these respondents' claims if they would be disallowed in part as claims of directors.

Accordingly, any consideration of Fribourg's claim as that of a director is precluded.

A word of caution as to the scope of our decision is desirable in view of Judge Learned Hand's opinion below. He suggested that if in fact liquidation had been imminent at the time of respondents' purchases or if it were fairly demonstrable, as a matter of experience, that a director free from all potential self-interest would be more likely to initiate liquidation proceedings or to effect a debt settlement than one not wholly disinterested, a court of equity should explore such issues and not dismiss them out of hand. This decision is not meant to negative the relevance of these issues when raised by a proper record. We mention these matters because the Securities and Exchange Commission urges the importance of a decision in this case for questions that may well arise in proceedings under Ch. X. In such proceedings the Securities and Exchange Commission, acting as the statutory advisor to the court, would be within its rightful function in submitting to the court the light of its experience on dealings of the general kind disclosed in this case. Here we have proven facts in a particular case, and not a body of evidence submitted by the Securities and Exchange Commission, presumably informed by expert understanding.

The decision of the Court of Appeals is

*Affirmed.*

MR. JUSTICE DOUGLAS took no part in the consideration or decision of this case.

MR. JUSTICE BURTON, with whom MR. JUSTICE BLACK joins, dissenting.

While corporate directors are not classed as express trustees, their obligations to their respective corporations are fiduciary in character. The more precarious the con-

dition of the corporation, the more it needs the undivided loyalty of its directors. Conflicts of interest must be resolved in its favor. An example of the need for doing so arises whenever, in the face of a prospect of the corporation's liquidation, some of its directors invest in its notes at a substantial discount. An inherent conflict of interests is thereby created. It may be necessary for them to choose between a corporate policy of reorganization which might be best for the corporation and one of liquidation which might yield more certain profits to them as noteholding directors. The fiduciary obligation of such directors to their corporation might thus conflict with their personal interests as noteholders. Their access to confidential corporate information emphasizes the good faith expected of them. The solution lies in making them accountable to their corporation for their profits from such an investment, much as a trustee must account to his beneficiaries for his profits from dealings in the subject matter of his trust. This result would spring wholly from the fiduciary nature of the obligations of directors to their corporation. It would need no proof of a breach of trust or of the actual overreaching of anyone.[1]

As long as a corporation enjoys the healthy status of a going concern, its directors generally may invest freely in its securities without accountability for their resulting

---

[1] Expression has been given to such a principle in many cases where there have also occurred breaches of trust of a nature so serious as not to require a final reliance upon the principle. See, e. g., In re The Van Sweringen Co., 119 F. 2d 231 (C. A. 6th Cir.); In re Norcor Mfg. Co., 109 F. 2d 407 (C. A. 7th Cir.); In re Philadelphia & Western R. Co., 64 F. Supp. 738 (E. D. Pa.); In re Jersey Materials Co., 50 F. Supp. 428 (N. J.); In re Los Angeles Lumber Products Co., 46 F. Supp. 77 (S. D. Cal.); In re McCrory Stores Corp., 12 F. Supp. 267, 269 (S. D. N. Y.). See also, 3 Fletcher, Cyclopedia of Corporations § 869.1 (1947); 2 Remington on Bankruptcy § 975.01 (Supp. 1947).

profits. Their directorships should make them accountable for such profits when their personal interests as purchasers of securities may conflict with their obligations as directors.[2] A mere excess of a corporation's liabilities over its assets may not subject its directors to this accountability. Nevertheless, any evidence of the financial instability of their corporation obligates the directors to overcome whatever presumption of conflict of interests between their own and those of the corporation or of its creditors that such evidence presents.

In the instant case there should be a finding whether or not, at the time of the purchases of the debentures in question, there was a sufficient prospect of liquidation to bring the interests of directors as debenture purchasers into conflict with the interests of their corporation. If such a conflict is established, it then will be necessary to determine the extent, if any, to which the relatives and associates of such directors are to be identified with them.

I agree with the reasoning of the dissent below. 173 F. 2d 944, 951. Accordingly, I would reverse the judgment and remand the cause for further findings in accordance with this opinion.

[2] Directors ordinarily may buy and sell the stock of their corporation, without accountability, except under special circumstances of unfairness in the particular transaction. 3 Fletcher, Cyclopedia of Corporations §§ 1171, 1174 (1947); Ballantine on Corporations § 80 (Rev. ed. 1946). Their purchase of stock increases their stake in the ultimate interests of the corporation they serve.